# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUSLIMS ON LONG ISLAND, INC., IMRAN MAKDA, and MOEEN QURESHI,<br><br><div align="center">*Plaintiffs*,</div><br><div align="center">*v.*</div><br>THE TOWN OF OYSTER BAY, SCOTT BYRNE, in his official capacity, JAMES CASTELLANE, in his official capacity, CLIFFORD CHABINA, in his official capacity, ANTHONY DILEONARDO, in his official capacity, ANGELO STANCO, in his official capacity, and LOUIS WARNER, in his official capacity,<br><br><div align="center">*Defendants*.</div> | CASE NO. |

# MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**PAGE**

Preliminary Statement......................................................................................................1

Statement of Facts..........................................................................................................2

    A.    MOLI Lacks a Mosque Necessary to Address the Needs of Its Congregation..........................................................................................................2

    B.    MOLI's Application for an Expanded Facility Receives Approvals from Municipal Professionals.....................................................................................5

    C.    The Town Enacts a Discriminatory Parking Ordinance .........................................7

    D.    An Islamophobic Pressure Campaign Is Launched Against MOLI's Application..........................................................................................................8

    E.    NCPC Recommends Denying MOLI's Application to "Send a Message" .............9

    F.    PAB Hears Testimony, But Delays Ruling on MOLI's Application....................11

    G.    Under Pressure from Islamophobic Demands, PAB Denies MOLI's Application........................................................................................................12

Argument ....................................................................................................................15

I.    Plaintiffs Are Substantially Likely to Succeed on the Merits..........................................15

    A.    Plaintiffs Are Substantially Likely to Succeed on Their Challenge to Local Law No. 6.........................................................................................................16

        1.    Local Law No. 6 Violates RLUIPA's Equal Terms Provision.................16

        2.    Local Law No. 6 Violates the Free Exercise Clause .................................17

    B.    Plaintiffs Are Substantially Likely to Succeed on Their Challenge to PAB's Denial of MOLI's Application .................................................................18

        1.    PAB's Denial Violated RLUIPA's Substantial Burden Provision ...........18

        2.    PAB's Denial Violated RLUIPA's Nondiscrimination Provision............21

        3.    PAB's Denial Violated the Free Exercise Clause......................................23

        4.    PAB's Denial Is Invalid Under Article 78 of the N.Y. C.P.L.R..............25

II.    Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction......................28

III.    The Public Interest Favors a Preliminary Injunction ........................................................28

Conclusion ...................................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam Cmty. Ctr. v. City of Troy*,
2022 WL 4541630 (E.D. Mich. Sept. 28, 2022) .................................................... 22

*Agudath Isr. of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) ...................................................................... *passim*

*Bagga v. Stanco*,
934 N.Y.S.2d 493 (2d Dep't 2011) ...................................................................... 27

*Capriola v. Wright*,
900 N.Y.S.2d 754 (2d Dep't 2010) .................................................................. 25, 27

*Cathedral Church of Intercessor v. Inc. Vill. of Malverne*,
2006 WL 572855 (E.D.N.Y. Mar. 6, 2006) ........................................................ 18

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*,
2017 WL 5015624 (D. Conn. Nov. 2, 2017) ........................................................ 19

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*,
768 F.3d 183 (2d Cir. 2014) ............................................................................... 21

*Chabad Lubavitch v. Borough of Litchfield*,
796 F. Supp. 2d 333 (D. Conn. 2011) .................................................................. 20

*Christian Fellowship Ctrs. of N.Y., Inc. v. Vill. of Canton*,
377 F. Supp. 3d 146 (N.D.N.Y. 2019) ............................................................ 16, 29

*Christian Fellowship v. City of Salinas*,
29 F.4th 596 (9th Cir. 2022) ............................................................................... 16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................................... 17, 23, 24

*Clark v. City of New York*,
560 F. Supp. 3d 732 (S.D.N.Y. 2021) .................................................................. 24

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
138 F. Supp. 3d 352 (S.D.N.Y. 2015) ............................................................ 20, 23

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
945 F.3d 83 (2d Cir. 2019) .................................................................................. 22

*Cottonwood Christian Ctr. v. Cypress Redev. Agency*,
218 F. Supp. 2d 1203 (C.D. Cal. 2002) .............................................................. 29

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Ernalex Constr. Realty Corp. v. Bellissimo,*
  681 N.Y.S.2d 298 (2d Dep't 1998).................................................................26

*Fortress Bible Church v. Feiner,*
  694 F.3d 208 (2d Cir. 2012).................................................................19, 20

*Fortress Bible Church v. Feiner,*
  734 F. Supp. 2d 409 (S.D.N.Y. 2010).................................................................19, 24

*Genesis Assembly of God v. Davies,*
  617 N.Y.S.2d 202 (2d Dep't 1994).................................................................25, 28

*Gospel Faith Mission Int'l, Inc. v. Weiss,*
  977 N.Y.S.2d 333 (2d Dep't 2013).................................................................25

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y.*
  *State Dep't of Corr. & Cmty. Supervision,*
  16 F.4th 67 (2d Cir. 2021).................................................................28

*Green Materials of Westchester v. Town of Cortlandt,*
  18 N.Y.S.3d 114 (2d Dep't 2015).................................................................26

*Hillside Islamic Ctr. v. Desena,*
  Case No. 603335/2024 (Sup. Ct. Jan. 15, 2024).................................................................28

*Hunt Valley Baptist Church, Inc. v. Balt. Cnty.,*
  2020 WL 618662 (D. Md. Feb. 10, 2020).................................................................22

*J&R Esposito Builders, Inc. v. Coffman,*
  584 N.Y.S.2d 73 (2d Dep't 1992).................................................................26, 28

*Jesus Christ Is the Answer Ministries, Inc. v. Balt. Cnty.,*
  915 F.3d 256 (4th Cir. 2019).................................................................23

*Lewis v. N.Y.C. Transit Auth.,*
  12 F. Supp. 3d 418 (E.D.N.Y. 2014).................................................................24

*Lidakis v. N.Y.C. Employees' Ret. Sys.,*
  899 N.Y.S.2d 816 (Sup. Ct. 2010).................................................................26, 27

*Mastrovincenzo v. City of New York,*
  435 F.3d 78 (2d Cir. 2006).................................................................15

*McDonagh v. Ambach,*
  528 N.Y.S.2d 730 (3d Dep't 1988).................................................................26

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*Omar Islamic Ctr. Inc. v. City of Meriden,*
633 F. Supp. 3d 600 (D. Conn. 2022)................................................................17, 18

*Opulent Life Church v. City of Holly Springs,*
697 F.3d 279 (5th Cir. 2012) ...............................................................................28

*Oyster Bay Assocs. Ltd. P'ship v. Town Bd. of Town of Oyster Bay,*
303 A.D.2d 410 (2d Dep't 2003) ....................................................................17, 25

*Pell v. Bd. of Ed. of Union Free Sch. Dist. No. 1,*
313 N.E.2d 321 (N.Y. 1974).................................................................................25

*Redeemed Christian Church of God v. Prince George's Cnty.,*
17 F.4th 497 (4th Cir. 2021) ................................................................................21

*River of Life Kingdom Ministries v. Vill. of Hazel Crest,*
611 F.3d 367 (7th Cir. 2010) ...............................................................................16

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020)...............................................................................................18

*Roman Cath. Diocese of Rockville Ctr. v. Inc. Vill. of Old Westbury,*
2012 WL 1392365 (E.D.N.Y. Apr. 23, 2012) ................................................19, 20

*Rosenkrantz v. McMickens,*
517 N.Y.S.2d 501 (1st Dep't 1987) .....................................................................26

*Tandon v. Newsom,*
593 U.S. 61 (2021)...........................................................................................17, 18

*Third Church of Christ v. City of New York,*
626 F.3d 667 (2d Cir. 2010)................................................................................16

*Tripathy v. Lockwood,*
2022 WL 17751273 (2d Cir. Dec. 19, 2022) .......................................................28

*Twin Cnty. Recycling Corp. v. Yevoli,*
688 N.E.2d 501 (N.Y. 1997)...............................................................................27

*United States v. City of Troy,*
592 F. Supp. 3d 591 (E.D. Mich. 2022)................................................................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977)........................................................................................21, 23

### TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ...................................................................28

*Weprin v. Council of the City of N.Y.*,
    835 N.Y.S.2d 849 (Sup. Ct. 2007).........................................................27

*Westchester Day Sch. v. Vill. of Mamaroneck*,
    504 F.3d 338 (2d Cir. 2007).............................................................20, 21

*WR Prop. LLC v. Twp. of Jackson*,
    2021 WL 1790642 (D.N.J. May 5, 2021) ..............................................23

**Statutes**

42 U.S.C. § 2000cc(a)(1) ............................................................................18

42 U.S.C. § 2000cc(b)(1) ...........................................................................16

42 U.S.C. § 2000cc(b)(2) ...........................................................................21

N.Y. C.P.L.R. § 7803(3) .............................................................................25

N.Y. Town Law § 274-a(8)....................................................................12, 23

**Other Authorities**

H.R. Rep. No. 106-219 (1999)....................................................................17

v

Plaintiffs Muslims on Long Island, Inc. ("MOLI"), Imran Makda, and Moeen Qureshi respectfully submit this memorandum of law in support of their motion for a preliminary injunction.

## PRELIMINARY STATEMENT

The Court should enter a preliminary injunction requiring Defendants—the Town of Oyster Bay and the individuals on the Town's Planning Advisory Board ("PAB")—to approve MOLI's application to construct a mosque capable of meeting the needs of its congregants.

MOLI has spent the past six years seeking approvals from the Town to expand its house of worship in the hamlet of Bethpage, so that it can adequately serve the spiritual needs of the local Muslim community. But MOLI's efforts have been met with a torrent of opposition. That opposition includes an Islamophobic pressure campaign launched by Town residents, accusing MOLI's congregants of being dangerous outsiders and warning that the mosque would transform Bethpage's demographics and spoil its "suburban" character. Sadly, instead of confronting that prejudice, local officials embraced it.

First, while MOLI's application was under consideration, the Town changed the rules governing the parking requirements for places of worship, including MOLI's mosque. Prior to the rule change, the Town calculated the parking need for places of worship based on the number of *seats*: 1 parking spot for every three seats. Under the new ordinance (Local Law No. 6), the Town now calculates the parking need based on the building's maximum *occupancy*: 1 parking spot per 3 persons occupancy. The difference between seats and occupants was consequential. MOLI previously needed to provide 86 parking spots—a requirement it easily satisfied. Now it needs 155, far beyond what its property can accommodate.

There was no justification for the rule change, other than to treat MOLI and houses of worship differently from secular uses, such as theaters, which continue to benefit from the 1-

parking-spot-per-3-seats ratio.  The ordinance therefore runs afoul of the guarantees of equal treatment in both the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment.

Second, on December 26, 2024, the Town issued its decision on MOLI's application and, predictably, blocked construction of the mosque.  The three-page order purported to justify denying MOLI an adequate house of worship on the grounds that mosque-generated traffic was a danger to the community and that the new mosque was inconsistent with the "suburban" community character of Bethpage.

In denying MOLI's application on these grounds, the Town ignored exhaustive analyses prepared by its own consultants that concluded the proposed mosque would have *no* significant negative impact on the surrounding area.  Instead, the order misrepresented pertinent testimony and repeated bigoted fears that the mosque would make Bethpage "resemble[] a borough of New York City and not a suburban town in Nassau County."  The slapdash rationales the Town manufactured to prevent construction of MOLI's proposed mosque thus hardly masked the true basis for that decision: anti-Muslim animus.  In the end, Defendants' denial of MOLI's application based on anti-Muslim bias was unlawful.  It violated, among other things, RLUIPA's prohibition on substantially burdening religious exercise.

Defendants' violations warrant immediate injunctive relief to ensure that MOLI can build an adequate facility to allow its congregants to practice their faith, free from discrimination at the hands of the Town.

## STATEMENT OF FACTS

### A.    MOLI Lacks a Mosque Necessary to Address the Needs of Its Congregation

MOLI is a non-profit religious congregation based in Bethpage.  Since 1998, MOLI has provided religious worship and education, as well as other community services, at its mosque at

320 Central Avenue in Bethpage.  Declaration of Imran Makda ("Makda Decl.") ¶ 10.  MOLI's mosque is the only Muslim house of worship in its immediate area and is one of just a handful of mosques near Bethpage.  *Id.* ¶ 11.  The mosque is in a mixed commercial and residential area, surrounded by private homes, local businesses, and several churches.  *See* Declaration of Muhammad U. Faridi Exs. 7 at 6–7; 25 at 20.[1]  MOLI purchased its property from an out-of-business restaurant, whose vacant parking lot had become a meeting place for drug users.  Makda Decl. ¶ 9.  In 2010, the mosque bought a second, smaller building on an adjacent parcel.  *Id.* ¶ 10.

MOLI's two buildings are inadequate to serve its congregants' religious needs.  *Id.* ¶ 16.  Because the structures do not have classrooms for MOLI's after-school religious education, children sit on the floor of the building's assembly area during classes, with curtains substituting for walls.  *Id.* ¶¶ 17–18.  The lack of sufficient classroom space also prevents MOLI from enrolling all who are interested, so scores of children are left on a waiting list.  *Id.* ¶ 19.

Collectively, the two buildings have just four bathroom stalls, creating access issues for the more than one hundred fifty students who attend after-school classes nightly and several hundred congregants who worship at the mosque each Friday for the mandatory weekly prayer (referred to as Jumma).  *Id.* ¶ 21.  The facilities also do not have adequate space for congregants to perform the Muslim ablution ritual of wudu, creating lines that cause congregants to arrive late for or miss prayer services.  *Id.* ¶¶ 22–23.

Nor do the structures have a private space for congregants to speak with the congregation's religious head (the imam), so profoundly private conversations occur in the main prayer area or parking lots, within earshot of other members of the community.  *Id.* ¶ 24.  And

---

[1] All citations to exhibits are to the Declaration of Muhammad U. Faridi unless otherwise stated.

when MOLI serves food—most importantly, for the dinner that breaks Muslims' fast during the Islamic month of Ramadan—MOLI congregants, lacking a dining area, are forced to eat outside the mosque or in the main prayer area, which is uncomfortable, inconvenient, and (in the case of the main prayer area) contrary to the teachings of Islam. *Id.* ¶¶ 25–26.

MOLI therefore decided to replace its two smaller buildings with a single, larger structure that could accommodate the needs of MOLI's existing congregation. *Id.* ¶ 28. The improved facility would combine MOLI's two parking lots, so cars traveling between the two would no longer exit onto the street. *Id.* ¶ 29. The following renderings show MOLI's current and planned facilities:

Figure A: MOLI's Current Buildings



Figure B: MOLI's Proposed Building



### B.    MOLI's Application for an Expanded Facility Receives Approvals from Municipal Professionals

In 2018, MOLI submitted a plan describing its new facility to the Town.  *See* Ex. 1 at 5. The submission marked MOLI's first step on the path towards an adequate building for its community.  But it also sparked a six-year travail of bureaucratic stonewalling, discriminatory legislation, and, ultimately, an Islamophobic pressure campaign from the community.

MOLI's application languished for five years before the Oyster Bay Department of Environmental Resources ("DER").  Although tasked with conserving the Town's natural resources, DER required MOLI to submit numerous addenda and resubmissions addressing everything from the notion that a larger mosque would impair the Town's "community character" and "suburban quality of life" to DER's preference for which species of shrub MOLI would plant.  *Id.* at 2, 5.  Yet MOLI persevered in addressing DER's objections and, on August 25, 2023, DER issued a report concluding that the proposed mosque would not meaningfully affect the local environment, traffic, emergency services, or community character.  Ex. 7.

Indeed, DER found the proposed mosque would "improve traffic safety," by combining the two buildings' parking lots and reconfiguring their driveways. *Id.* at 8.

DER based its findings on a "comprehensive analysis" that MOLI's consultants, R&M Engineering, had "prepared to examine the potential impacts of the proposed action on transportation resources." *Id.* at 12. R&M reviewed and submitted three years' worth of traffic data from the New York State Department of Transportation for the intersection where the mosque is located. Ex. 6 at 14. The data indicated that 34,032 vehicles passed through the intersection each day, with 37.27 million vehicles entering the intersection over the course of three years. *Id.* Yet, during that three-year period, there were just 57 accidents—primarily rear-ending and overtaking—11 of which resulted in injury and none of which had caused a fatality or involved a pedestrian or cyclist. *Id.* Nor was there any evidence that these incidents were caused by someone entering or exiting the mosque. Based on this data, R&M found "there should not be any issues with pedestrians crossing" the intersection where the mosque is located, and it also concluded that "there is no anticipated increase in traffic or parking conditions associated with the project" and "[n]o new traffic is anticipated to be generated by the site." *Id.* at 3, 5, 14.

DER's *own* consultants—at L.K. McLean Associates ("LKMA")—agreed that "no additional traffic w[ould] be generated by the proposed project." Ex 3 at 18. And even if there were a slight increase in traffic, LKMA explained, it was "not likely to result in a detrimental impact on the adjacent roadways." *Id.*

The Nassau County Department of Public Works ("DPW"), which reviews construction plans with potential impacts on county roads, likewise approved MOLI's initial site plan, as did the Town's Code Enforcement Bureau and Highway and Engineering Divisions. *See* Ex. 27 at 4.

### C.    The Town Enacts a Discriminatory Parking Ordinance

While DER forced MOLI to repeatedly re-submit its application, the Town erected another barrier to MOLI's application: it dramatically increased the minimum parking requirements for new places of worship to a number that MOLI's proposed mosque could never satisfy.

From the outset, MOLI's site plan had complied with the Town's parking requirements. Under the ordinance in place when MOLI submitted its application, "[p]laces of worship" needed "1 [parking stall] per 3 seats or, if no seats, 1 per 100 sq. ft. of floor space used for public assembly." Declaration of Alan Weinstein ("Weinstein Decl.") Ex. 2 at 2. The ordinance imposed an analogous requirement on theaters—which have similar parking needs—obligating them to provide "1 [parking stall] per 3 seats." *Id.* Under that ordinance, MOLI's site plan required just 86 parking spots. Ex. 2. MOLI has always been, and remains, willing to provide those parking spots. Makda Decl. ¶ 39.

But the Town's Department of Planning and Development ("DPD") lobbied the Town to raise the number of parking spots required for places of worship to levels it knew MOLI could not provide. Ex. 4 at 10–11. Specifically, DPD pressed for a new law—Local Law No. 6—increasing the parking requirements for new houses of worship. Local Law No. 6 abandoned a formula primarily based on the number of *seats* to one based on a building's *occupancy*, whereby places of worship would need to provide one parking spot "per 3 persons occupancy." Ex. 5 at 5. A building's occupancy relates to the maximum number of people who can physically fit in a building. Weinstein Decl. ¶ 18. Because a building's occupancy exceeds the number of seats within that building, Local Law No. 6 increased the parking required for places of worship. *Id.*

Local Law No. 6 also treated houses of worship unequally from comparable secular buildings. Despite the parity of parking required for places of worship and theaters under the

prior regime, Local Law No. 6 raised the parking requirements for places of worship using an occupancy-based formula, while leaving theaters under the lenient seat-based calculation. Instead, places of worship now need parking comparable to obviously dissimilar buildings like "[b]ars/discotheques/dance hall/night club/cabarets," which must provide one spot per three persons occupancy.  *Id.* Ex. 4 at 3.

On June 14, 2022, the Town Board passed Local Law No. 6, thereby hindering the construction of new places of worship in Oyster Bay.  Ex. 5 at 8.  Armed with Local Law No. 6, DPD recalculated the parking required for the proposed mosque and concluded MOLI needed to provide 155 parking spaces—an increase of 80% from the 86 spots the Town had previously deemed sufficient.  Exs. 18; 20 at 2.  But DPD acknowledged that MOLI's application otherwise "satisfactorily addressed all concerns relative to the Town of Oyster Bay's Zoning Ordinances." Ex. 20 at 4.

### D.    An Islamophobic Pressure Campaign Is Launched Against MOLI's Application

The Town's new parking requirements under Local Law No. 6 required MOLI to obtain a variance from the Town Zoning Board of Appeals.  *Id.* at 2.  Accordingly, MOLI sought approval from the Town's PAB, as conditional approval from PAB would allow MOLI to proceed to the Zoning Board of Appeals.  PAB scheduled a public meeting for January 11, 2024. *See* Ex. 12.  Under the Town's land use regime, PAB's approval is contingent upon a recommendation from another municipal body, the Nassau County Planning Commission ("NCPC").  If NCPC votes against a site plan, approval from PAB is still possible, but it requires a supermajority, as opposed to a simple majority when NCPC approves the site plan.

Once nearby residents learned of PAB's and NCPC's meetings—both scheduled for January 11, 2024—they began lobbying local officials, including a prominent Nassau County

Legislator, Rose Marie Walker, to oppose construction of the mosque.  Their comments revealed vitriolic anti-Muslim sentiments within the Town.  For example, a resident wrote that the mosque "in no way fits in with our neighborhood and suburban way of life."  Ex. 8 at 4.  Allowing the mosque to be built would amount to "giv[ing] up our neighborhood," others stated, and "we will never be able to reverse course after that."  *Id.* at 3, 5.  Many accused MOLI's congregants of being outsiders, falsely asserting that its "worshippers are not Bethpage or surrounding area residents," but rather "newcomers that are looking to change our quality of life to suite [sic] the needs of only a certain population," whose "children will likely NOT … integrat[e] with the Bethpage community."  Ex. 9 at 2–3, 6.

Some residents took to social media.  One user wrote on Facebook: "Building a two story mosque a block away from a street renamed after someone who died on 9/11 ? Not in very good taste in my opinion."  Ex. 10.  A local business posted that a "Mega Mosque [was] being proposed" at PAB meeting, leading others to comment "the takeover has started," "we have Jewish people living here it's not right," and "[d]oes anybody remember that there were two towers in Manhattan or did people forget and now we're asked to put a place like this in downtown bethpage really?!"  Ex. 11 at 2, 5, 13, 25.

Ms. Walker decided to champion the bigots' cause.  On the day of the meeting, she wrote a letter urging NCPC to reject MOLI's site plan.  Ex. 12.  She also took the unusual step of intervening in the NCPC's January 11 "pre-meeting" on MOLI's application—even though Ms. Walker is not a member of NCPC and does not regularly attend its meetings—to reiterate that NCPC should block the proposed mosque.  *See* Ex. 13 at 10.

### E.    NCPC Recommends Denying MOLI's Application to "Send a Message"

At the "pre-meeting," NCPC informed MOLI that it lacked a quorum to take any official action and adjourned its meeting to a later date.  *See id.* at 1, 10–11.  Based on NCPC's

adjournment, MOLI agreed to postpone its PAB meeting as well so it could offer good-faith concessions to its opponents. MOLI slightly modified its site plan to create four additional parking spots. *See* Ex. 17. The Nassau County DPW approved the amended plan on March 4, 2024, *id.*, and PAB scheduled a public hearing on it for July 18, 2024, Ex. 23.

Opponents of the mosque shared news of the adjournment on social media, along with instructions to "[e]mail our planning commission with a cc to Rose Walker with why you oppose [MOLI's application]." Ex. 15. Mirroring tactics often deployed to resist the construction of minority houses of worship nationwide, opponents urged objectors to "voice their concerns," yet cloak their prejudice in traffic jargon, by "focusing on the safety concerns" like "clogging roadways," "crossing mid block," or "the dangers of people parking on side streets." *Id.*

MOLI returned to NCPC on the morning of July 18, 2024 to obtain NCPC's recommendation to PAB on the revised site plan. NCPC focused on purported traffic safety issues at the mosque, Ex. 21 at 18—even though MOLI's and the Town's *own* consultants had concluded the proposed mosque would not substantially impact traffic, and the Nassau County body with jurisdiction over the roads surrounding the property, DPW, had repeatedly approved MOLI's site plan.

Ms. Walker—back again—echoed NCPC's concerns, opining that MOLI's congregants had "been good neighbors" but "often they just stop in the middle of either one of [the adjacent] roads and just let people out." *Id.* at 24. She concluded that, for the congregants' own good, the mosque should not be expanded, since it is "very dangerous even for those attending the mosque." *Id.*

The NCPC commissioners agreed. Commissioner Reid Sakowich said he opposed MOLI's application due to his negative views of an unrelated mosque in New Hyde Park, a

village fifteen miles away: "I've lived this experience in New Hyde Park…. I've seen Hillside Avenue in New Hyde Park shut down on a many, many, many times by people just being late for services and just leaving the cars out on the roads." *Id.* at 32.

MOLI responded by offering a remarkable concession: It would voluntarily cap the new mosque's occupancy at just 264 people, approximately 56% of its physical capacity, to prevent any possibility of parking or traffic issues. *Id.* at 35.

NCPC remained unsatisfied. Commissioner Sakowich reiterated, "I live this in New Hyde Park. And it's just [] horrendous." Ex. 22 at 121. One commissioner, Neal Lewis, dissented. He explained that he had grown up in Bethpage and his family "often park[ed] in properties that [were] not in the parking lot" when attending church services. *Id.* at 120. "[I]t's only … once or twice, you know, a week that it's bad. And … as long as it's legal parking, hopefully it's okay." *Id.* at 120–21. Acting Chair Jeffrey Greenfield retorted: "In my parish, it's only three times a year." *Id.* He urged the commission to deny MOLI's application to "send a message" to PAB. *Id.* at 122. NCPC voted five-to-one to recommend that PAB deny MOLI's application. Ex. 23.

### F.    PAB Hears Testimony, But Delays Ruling on MOLI's Application

That evening, PAB finally held a meeting on MOLI's application. Ex. 24. At the meeting, Ms. Walker—appearing for the third time in opposition to MOLI—repeated her unfounded claims that the mosque would worsen traffic safety. Ex. 25 at 31–32. Another opponent testified that Muslim boys would use the second floor of the mosque to leer at his teenage daughter and her friends in his pool. *Id.* at 33.

Following this discussion, PAB voted unanimously to hold the public record open for further input and to reconvene on September 12, 2024 to render a decision. *Id.* at 47–48. Opponents submitted a flurry of Islamophobic emails urging PAB to deny MOLI's application.

Ex. 26.  They warned, for example, that the mosque would "change the entire demographic and overall landscape of the community," and falsely asserted that "only men pray" at the mosque and that MOLI "promote[s] men to be more valued than women."  *Id.* at 3, 5, 9.  Despite scheduling its vote for September 12, PAB stonewalled for two months and refused to act on MOLI's proposal, in open defiance of New York law.  *See* N.Y. Town Law § 274-a(8) (requiring a decision within sixty-two days of a public hearing).

### G.    Under Pressure from Islamophobic Demands, PAB Denies MOLI's Application

On November 14, 2024, PAB met again and voted unanimously and without discussion to deny MOLI's application.  Ex. 27 at 2–3.  PAB then waited over a month, until December 26, 2024, to issue a written decision.  Ex. 28 ("Denial").  This delay also violated state law, which required PAB to issue a written decision within *five business days* of PAB's vote.  *See* N.Y. Town Law § 274-a(8).

PAB's three-page decision purported to rely on vague parking and traffic concerns that lacked any factual basis.  According to PAB, MOLI's current buildings do not have sufficient parking and this "current shortage of parking requires worshippers to park on residential streets as well as main roads."  Denial at 4.  PAB asserted that "[m]any residential neighbors testified that cars from the place of worship park haphazardly and block their driveways," and "expressed their concerns regarding increased traffic … and increased parking on residential streets."  *Id.* PAB averred that those concerns demonstrated that the "situation imposes a clear threat to the health, safety, and welfare of the surrounding neighbors."  *Id.*

To shore up those generalized suspicions of traffic problems, PAB relied on the alleged statement of one "resident" who "testified that while dropping off her grandchildren at a local daycare in her [SUV] she was unable to fit down the residential streets with the overflow parking

from the place of worship." *Id.* And "if her [SUV] couldn't fit down the street," she contended, then "an ambulance, fire truck, or any large emergency vehicle certainly would not fit down the street."[2] *Id.* Based on its conclusion that MOLI's current mosque created traffic safety issues, PAB declared that a larger building "will only intensify these unsafe conditions."[3] *Id.*

But the evidence before PAB flatly contradicted those speculative concerns. After analyzing three-years' worth of traffic data, the consultants retained by MOLI and the Town alike had found that the proposed mosque would have *no* significant impact on traffic safety. Exs. 3 at 18; 6 at 14. Indeed, the data revealed that despite 37.27 million vehicles traveling through the intersection outside the mosque, there had been no accidents involving a pedestrian or cyclist and no fatalities. Ex. 6 at 14. While eleven crashes resulted in injuries, there was no evidence linking any of those accidents to MOLI's congregants, as opposed to the other tens of millions of individuals who drove through the intersection. *See id.*

Likewise, several government agencies—including the Town DER and County DPW—had determined that the proposed mosque would not negatively impact parking or traffic. Exs. 7; 17. DER found that "parking will remain available along the adjacent public streets to accommodate the parking needs of the community during the limited time periods of peak activities at the mosque." Ex. 7 at 13. DER also concluded the proposed mosque would not adversely impact emergency services or public health and safety and would, in fact, "improve traffic safety." *Id.* at 10. Moreover, MOLI repeatedly told PAB the proposed mosque would

---

[2] PAB appears to have invented this testimony, which Plaintiffs cannot locate in the public record.

[3] Although PAB did not cite Local Law No. 6 (or any other legal authority), it characterized the proposed mosque as "non-conforming." Denial at 4. As Local Law No. 6 was the sole ordinance MOLI's site plan had not satisfied, Ex. 20 at 4, PAB's decision applied the discriminatory parking rule.

serve its *existing* congregation and would not expand its community.  Ex. 25 at 2, 17.  Consistent with that purpose, MOLI had even offered to cap the mosque's occupancy to avoid any possible increase in traffic.  *Id.* at 7.  Yet PAB simply ignored those facts.

PAB also justified its denial on the notion that the mosque would negatively impact the character of the neighborhood.  PAB cited testimony that the mosque made "the neighborhood resemble[] a borough of New York City and not a suburban town in Nassau County."  Denial at 4.  The merits of that dog-whistle argument aside, PAB misrepresented the underlying statement.  Rob Kossman, a resident of Bethpage, wrote a letter to Ms. Walker on January 9, 2024, observing: "Parking – St. Lukes Church/Daycare.  My block also sees a lot of activity due the daycare on the corner of Kearney Ave.  Between the children pick ups & drop offs, AA meetings and religious activity, the parking on my street can resemble a borough of NYC, not suburban Nassau County."  Ex. 9 at 4.  Thus, Kossman attributed the parking shortage on his street to a nearby daycare and church, not MOLI's mosque.

PAB's written decision also failed to explain how a mosque would be inconsistent with the area's "suburban" character—particularly since MOLI's property is located in the Town's General Business district, where places of worship are expressly permitted, and the property is next to several other houses of worship as well as a smoke shop, psychic, and gas station.  *See* Exs. 7 at 9; 25 at 20.  Indeed, PAB admitted it was treating the mosque differently, stating: "we have many non-conforming non-residential uses that do impose a negative impact on the surrounding properties that frequently generate complaints from neighbors."  Denial at 4–5.  But PAB offered no justification for its decision to treat the mosque worse than those "many" other properties PAB tolerates.  Nor did PAB acknowledge DER's finding that the proposed mosque would not negatively impact community character.  Ex. 7 at 22.  PAB nevertheless remarked:

14

"Almost all the testimony received indicates that the existing place of worship already poses a negative impact on the surrounding neighbors." Denial at 4. That sweeping assertion disregarded the testimony of numerous individuals celebrating the positive impacts of the mosque and its need for a larger facility. *E.g.*, Exs. 25 at 11, 40–41; 26 at 2; *see also* Declaration of Moeen Qureshi ¶¶ 8–9.

The lack of support for PAB's purported concerns reveals that they were nothing more than a pretext for discrimination. MOLI's multi-year journey to secure an adequate facility for its congregation thus ended with a three-page written decision from PAB that elevated unfounded suspicions over evidence and transformed opponents' bigotry into government action.

## ARGUMENT

Courts preliminarily enjoin government action taken pursuant to a regulatory scheme where, as here, the moving party establishes: (1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, and (3) public interest weighing in favor of granting the injunction. *See Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). When the moving party seeks a mandatory injunction that will "alter the status quo," the first element requires "a clear or substantial likelihood of success on the merits." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (internal quotation marks omitted). Plaintiffs satisfy each of these elements.

## I.      Plaintiffs Are Substantially Likely to Succeed on the Merits

As demonstrated below, Plaintiffs are substantially likely to succeed on their claims that: (A) Local Law No. 6 violates the prohibitions on unequal treatment in RLUIPA and the Free Exercise Clause of the First Amendment; and (B) Defendants' denial of MOLI's application breached RLUIPA's prohibitions on substantially burdening or discriminating against religious

land uses, Plaintiffs' constitutional right to free exercise, and Article 78's proscription against arbitrary or capricious government action.

A.    **Plaintiffs Are Substantially Likely to Succeed on Their Challenge to Local Law No. 6**

1.    **Local Law No. 6 Violates RLUIPA's Equal Terms Provision**

RLUIPA forbids local governments from imposing or implementing land use regulations "in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). This provision demands that, "in practical terms, secular and religious institutions are treated equally." *Third Church of Christ v. City of New York*, 626 F.3d 667, 671 (2d Cir. 2010).

By its plain terms, Local Law No. 6 treat "places of worship" less favorably than comparable secular assemblies. Although secular gatherings at theaters must provide one parking spot "per 3 *seats*," "places of worship" are instead subject to the more onerous standard of "1 [parking spot] per 3 *persons occupancy*." Weinstein Decl. Ex. 4 at 2 (emphasis added). Thus, "the Ordinance treats religious assemblies less well than [comparable] secular assemblies," in violation of RLUIPA. *Christian Fellowship Ctrs. of N.Y., Inc. v. Vill. of Canton*, 377 F. Supp. 3d 146, 157 (N.D.N.Y. 2019).

Theaters are widely acknowledged as comparable secular uses to houses of worship. *See Christian Fellowship v. City of Salinas*, 29 F.4th 596, 607–08 (9th Cir. 2022) ("[T]heatres … are similarly situated to religious assemblies."); *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 373 (7th Cir. 2010) (en banc) ("[A] church is more like a movie theater, which also generates groups of people coming and going at the same time."); *United States v. City of Troy*, 592 F. Supp. 3d 591, 605 (E.D. Mich. 2022) ("[P]laces of worship must be treated on equal terms with nonreligious institutions that are similarly situated … [such as] theatres …

16

and similar assemblies where large groups of people come and go at set times."). Congress, in enacting RLUIPA, also viewed theaters as comparable to places of worship. *See* H.R. Rep. No. 106-219, at 19–20 (1999) ("[T]heaters are often permitted as of right in zones where churches require a special use permit."). Indeed, even the *Town* concluded that places of worship and theaters had comparable parking needs, as it previously imposed equal requirements on them. By subjecting places of worship to stringent parking requirements that do not apply to the comparable secular buildings, Local Law No. 6 violates RLUIPA's guarantee of equal terms.

## 2. Local Law No. 6 Violates the Free Exercise Clause

Local Law No. 6 also violates the Free Exercise Clause. Under that clause, "[o]fficial action burdening religious conduct that is not both neutral and generally applicable … is subject to strict scrutiny." *Agudath*, 983 F.3d at 631. Local Law No. 6 is deficient across the board: it is neither neutral nor generally applicable, and it fails strict scrutiny.

Defendants failed to uphold even "the minimum requirement of neutrality … that a law not discriminate on its face," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), by "explicitly imposing on 'houses of worship' restrictions inapplicable to secular activities," *Agudath*, 983 F.3d at 631; *see Omar Islamic Ctr. Inc. v. City of Meriden*, 633 F. Supp. 3d 600, 624 (D. Conn. 2022).

Nor is Local Law No. 6 generally applicable. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (regulations are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise"). Specifically, though places of worship and theaters are both buildings where individuals congregate for discrete periods of time and thus arrive and depart together, Local Law No. 6 imposes a burdensome occupancy-based parking requirement on places of worship and allows theaters to operate under a less restrictive seat-based standard. By singling out places of worship for inferior treatment, Local Law No. 6 is—

17

by definition—not generally applicable. *See Omar*, 633 F. Supp. 3d at 623 (ordinance not generally applicable because it allowed "theaters[] to operate as of right" while "places of worship, however, were required to obtain a special permit").

Because Local Law No. 6 is not neutral and generally applicable, Defendants must prove that their actions were "narrowly tailored to serve a compelling state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (internal quotation marks omitted). Defendants cannot shoulder that burden. They have never justified Local Law No. 6, and now it is too late to try, since rationales "invented *post hoc* in response to litigation" cannot satisfy strict scrutiny. *Agudath*, 983 F.3d at 633. Even if Defendants could identify a compelling interest, imposing burdensome parking requirements only on new houses of worship cannot be a narrowly tailored means of promoting that goal. Local Law No. 6's occupancy-based approach requires places of worship to build far more parking than necessary, as they seldom operate at full capacity. Weinstein Decl. ¶¶ 26–28. Moreover, because Defendants have not shown that places of worship are "more dangerous" than theaters "when the same [parking] precautions are applied," the First Amendment dictates that the "precautions that suffice for [theaters] suffice for religious exercise too." *Tandon*, 593 U.S. at 63.

**B.    Plaintiffs Are Substantially Likely to Succeed on Their Challenge to PAB's Denial of MOLI's Application**

**1.    PAB's Denial Violated RLUIPA's Substantial Burden Provision**

RLUIPA also forbids local governments from imposing or implementing land use regulations "in a manner that imposes a substantial burden on the religious exercise of a person," without furthering a compelling government interest through the least restrictive means. 42 U.S.C. § 2000cc(a)(1). A defendant violates that provision when it "(1) imposes a substantial burden, (2) on the 'religious exercise,' (3) of a person, institution, or assembly," *Cathedral*

*Church of Intercessor v. Inc. Vill. of Malverne*, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006), unless the defendant "demonstrate[s] that [its action] furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest," *Roman Cath. Diocese of Rockville Ctr. v. Inc. Vill. of Old Westbury*, 2012 WL 1392365, at *7 (E.D.N.Y. Apr. 23, 2012).

Plaintiffs have been "substantially burdened by [their] inability to construct an adequate facility." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012). *Feiner* is instructive. There, a town denied a church's application for an expanded facility. *Id.* at 214. The Second Circuit held that the denial imposed a substantial burden on the church, because its current facility lacked space to "perform full-immersion baptisms" or "accommodate handicapped students or higher-level subjects" in the church's religious school. *Id.* at 219. So, too, here: MOLI's current buildings do not have sufficient wudu stalls, a private space for consultations with the imam, or dedicated classrooms. Makda Decl. ¶¶ 18–19, 22–24. Nor do the buildings contain adequate bathrooms for congregants, or a dining space and kitchen for fast-breaking during Ramadan. *Id.* ¶¶ 21, 26; *see Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 2017 WL 5015624, at *20 (D. Conn. Nov. 2, 2017) ("[T]hese meals are part of the Chabad's religious exercise, [so] the court concludes that the Chabad would be substantially burdened if the shul space was not large enough to accommodate seating for meals.").

The "conclusion that [Plaintiffs were] substantially burdened is bolstered by the arbitrary, capricious, and discriminatory nature of the Town's actions." *Feiner*, 694 F.3d at 219. Defendants' denial of MOLI's application was replete with indicia of animus. "Defendants ignored feedback from their own consultants" regarding the proposed mosque's impacts on traffic and parking. *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 502 (S.D.N.Y. 2010).

MOLI nevertheless offered to voluntarily cap its occupancy.  *See id.* ("Plaintiffs agreed to implement, at their own expense, every mitigation measure requested by Defendants.").  But Defendants were unmoved, insisting instead that MOLI build so many parking spots that the plot would no longer fit its proposed facility.  *See Chabad Lubavitch v. Borough of Litchfield*, 796 F. Supp. 2d 333, 343 (D. Conn. 2011) ("[I]f [plaintiff] conformed its plans to the [defendant's] specification, it would need to sacrifice a good portion of the spaces that it believes is necessary to the exercise of its religion.").  Thus, despite MOLI's good-faith efforts to accommodate Defendants, Defendants subjected MOLI's application to a seven-year process of "delay, uncertainty, and expense," culminating in a discriminatory denial.  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 433 (S.D.N.Y. 2015).  RLUIPA prohibits such undue intrusion on Plaintiffs' religious exercise.

Defendants cannot demonstrate that the denial was "the least restrictive means of furthering [a] compelling interest."  *Rockville*, 2012 WL 1392365, at *7.  PAB's "traffic" and "community character" concerns do not qualify as "compelling interests," because the proposed mosque does not pose a "substantial threat to public safety, peace, or order."  *Tartikov*, 138 F. Supp. 3d at 418 (internal quotation marks omitted).  To the contrary, the Town DER found that the mosque would "*improve* traffic safety."  Ex. 7 at 8 (emphasis added).  PAB's unfounded concerns were therefore "disingenuous."  *Feiner*, 694 F.3d at 219; *see Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) ("[T]he application was denied not because of a compelling governmental interest … but was denied because of undue deference to the opposition of a small group of neighbors.").  Moreover, the denial of MOLI's application was not the least restrictive means of pursuing those purported goals, as Defendants had "the opportunity to approve the application subject to conditions," namely the voluntary occupancy

cap, "but refused to consider doing so." *Mamaroneck*, 504 F.3d at 353; *see Redeemed Christian Church of God v. Prince George's Cnty.*, 17 F.4th 497, 512 (4th Cir. 2021) (denial of church's application was not the least restrictive means because the county failed to "consider[] alternatives … before denying the Application"). Thus, the unjustifiable burdens Defendants imposed on Plaintiffs violated RLUIPA.

### 2.    PAB's Denial Violated RLUIPA's Nondiscrimination Provision

RLUIPA also prohibits discrimination "against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). To establish a violation of RLUIPA's nondiscrimination provision, a plaintiff must show the defendant acted with "discriminatory intent." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). A plaintiff can establish discriminatory intent by identifying: "(1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect (i.e., a 'gerrymandered' law); [or] (3) a facially neutral law that is enforced in a discriminatory manner." *Id.* The Second Circuit has stressed that courts assessing discriminatory intent must consider:

> the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available.

*Id.* at 199. In this case, the "circumstantial and direct evidence of intent" is overwhelming. *Id.*

The denial of MOLI's application followed an outpouring of Islamophobic comments and advocacy from members of the Bethpage community. One resident warned the mosque would bring "newcomers that are looking to change our quality of life." Ex. 9 at 6. Another

commented that permitting the construction of the mosque "a block away from a street renamed after someone who died on 9/11" was "[n]ot in very good taste." Ex. 10. Testifying before PAB, a neighbor speculated that Muslim boys would leer at his daughter and her friends in the pool. Ex. 25 at 33. And, in letters to PAB, opponents repeated hateful stereotypes, claiming "only men pray" at the mosque and MOLI "promote[s] men to be more valued than women." Ex. 26 at 5, 9.

Those disgraceful comments are probative of intent, even if "[i]t is impossible for [the Court] to glean precisely how the board weighed the [biased] comments." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 122 (2d Cir. 2019). For example, courts have held that "an email from a community member to zoning board of appeals member … that included derogatory comments about Islam and the presence of Muslims in the City," *Adam Cmty. Ctr. v. City of Troy*, 2022 WL 4541630, at *3 (E.D. Mich. Sept. 28, 2022), and "derisive comments [on social media] about [a] proposed church, most commonly referring to it as a 'megachurch,'" *Hunt Valley Baptist Church, Inc. v. Balt. Cnty.*, 2020 WL 618662, at *4 (D. Md. Feb. 10, 2020), indicated that official actions against places of worship were the result of residents' animus. The fact that Defendants "were responsive to [opponents'] comments and the animus they embodied" establishes discriminatory intent, even without "direct evidence of any personal religious bias on the part of" Defendants. *Tartikov*, 945 F.3d at 122.

Yet local officials went beyond tacit acquiescence by making anti-Muslim statements of their own. For example, NCPC Commissioner Sakowich insisted on voting against MOLI's application because of his personal interactions with unrelated Muslims attending an unrelated mosque: "I live this in New Hyde Park. And it's just horrendous." Ex. 22 at 121. PAB reinforced the public's concerns that the mosque would transform the demographics of Bethpage

by contorting a resident's comment regarding a day care and church into a stark warning that allowing Muslims to practice their faith would cause "the neighborhood [to] resemble[] a borough of New York City and not a suburban town in Nassau County." Denial at 4.

Finally, "impermissible influence may be inferred where expressions of community bias are followed by irregularities in government decision-making." *Jesus Christ Is the Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019). The Town's treatment of PAB's application was riddled with irregularities. PAB departed—without explanation—from the approvals issued by the Town DER and County DPW based on the analyses prepared by both MOLI's and the Town's consultants. *See id.* at 264 ("The first irregularity occurred when the Board denied [plaintiff's] petition even though the County Director of the Department of Planning didn't oppose it."). And PAB delayed its meeting on MOLI's application and then withheld its written decision for weeks, all in violation of New York law. *See* N.Y. Town Law § 274-a(8).

### 3.    PAB's Denial Violated the Free Exercise Clause

"The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534. Under the Free Exercise Clause as under RLUIPA, the Court must therefore review the full context of Defendants' denial for "direct and circumstantial evidence" of Defendants' impermissible hostility towards Plaintiffs' religion. *Id.* at 540 (citing *Arlington Heights*, 429 U.S. at 266–68). When such hostility is present, Defendants' denial is not neutral or generally applicable and is therefore subject to "the most rigorous of scrutiny." *Id*. at 546.

Here, the evidence inexorably leads to one conclusion: Defendants denied Plaintiffs' proposed mosque due to anti-Muslim animus. *See id.* at 541 (emphasizing "significant hostility exhibited by residents"); *Tartikov*, 138 F. Supp. 3d at 425; *WR Prop. LLC v. Twp. of Jackson*,

2021 WL 1790642, at *9 (D.N.J. May 5, 2021) (officials violated Free Exercise Clause by preventing the construction of Orthodox Jewish schools after "residents expressed hostility towards the Orthodox Jewish community").

Defendants' flat denial of MOLI's application also "proscribe[d] more religious conduct than is necessary to achieve [PAB's] stated ends." *Lukumi*, 508 U.S. at 538. Notwithstanding the government decisions and empirical studies concluding the proposed mosque would *not* negatively impact parking or traffic, Plaintiffs agreed to voluntarily cap the mosque's occupancy to avoid even the possibility of such an impact. Yet PAB rejected Plaintiffs' proposal out of hand without considering alternative measures to address the mosque's purported traffic and parking impacts, revealing that PAB's stated rationales were spurious. *Cf. Agudath*, 983 F.3d at 633 ("[T]he government must show that it seriously undertook to address the problem with less intrusive tools readily available to it." (internal quotation marks omitted)). Indeed, PAB's professed concerns are inconsistent with its announcement that it had tolerated "many [other] non-conforming non-residential uses." Denial at 4; *see Lewis v. N.Y.C. Transit Auth.*, 12 F. Supp. 3d 418, 456 (E.D.N.Y. 2014) (jury could find free exercise deprivation based on defendant's actions against religious but not secular violations of a uniform policy).

Thus, the evidence regarding PAB's denial establishes that Defendants impermissibly impeded Plaintiffs' free exercise. As Defendants cannot satisfy strict scrutiny, *see supra* at 20–21, they violated the First Amendment.[4]

---

[4] Because "New York's free exercise clause is more protective of religious exercise than its federal counterpart," *Clark v. City of New York*, 560 F. Supp. 3d 732, 743 (S.D.N.Y. 2021) (internal quotation marks omitted), "Defendants also have violated Plaintiffs' Free Exercise rights under the New York State Constitution," *Feiner*, 734 F. Supp. 2d at 518.

### 4.    PAB's Denial Is Invalid Under Article 78 of the N.Y. C.P.L.R.

Because PAB's denial of MOLI's application for the expanded mosque was "arbitrary and capricious" and an "abuse of discretion," that decision was invalid under Article 78 of the New York Civil Practice Law and Rules.  N.Y. C.P.L.R. § 7803(3).

To withstand Article 78 review, government action must have "a rational basis."  *Pell v. Bd. of Ed. of Union Free Sch. Dist. No. 1*, 313 N.E.2d 321, 325 (N.Y. 1974) (internal quotation marks omitted).  Courts therefore vacate decisions rendered "without sound basis in reason" or "without regard to the facts."  *Id.*  When government bodies issue decisions regarding religious land uses, heightened duties apply.  "[G]reater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made."  *Gospel Faith Mission Int'l, Inc. v. Weiss*, 977 N.Y.S.2d 333, 335 (2d Dep't 2013) (quoting *Genesis Assembly of God v. Davies*, 617 N.Y.S.2d 202, 203 (2d Dep't 1994)).  The decisionmaker must therefore "suggest measures to accommodate the proposed religious use while mitigating the adverse effects on the surrounding community to the greatest extent possible."  *Capriola v. Wright*, 900 N.Y.S.2d 754, 756 (2d Dep't 2010) (internal quotation marks omitted).

PAB's decision fell woefully short of those standards.  The evidence before PAB—the reports of both MOLI and the Town's own consultants and decisions issued by the Town DER and County DPW—demonstrated that the proposed mosque would *not* have a negative parking or traffic impact, and would in fact *improve* traffic safety.  As PAB did not articulate any grounds for disagreeing with DER and DPW, its deviation from their conclusions was arbitrary.  *See Oyster Bay Assocs. Ltd. P'ship v. Town Bd. of Town of Oyster Bay*, 303 A.D.2d 410, 410–11 (2d Dep't 2003) ("There was insufficient evidence to support a deviation from the initial SEQRA finding of the Town Environmental Quality Review Commission, which was in favor of the

proposed project.").  By "disregard[ing those] relevant facts," PAB failed to conduct "a careful and painstaking assessment of all the available evidence," and thus acted arbitrarily. *Rosenkrantz v. McMickens*, 517 N.Y.S.2d 501, 503 (1st Dep't 1987); *see Lidakis v. N.Y.C. Employees' Ret. Sys.*, 899 N.Y.S.2d 816, 822 (Sup. Ct. 2010) (decision that "failed to address any of the evidence petitioner submitted" and instead "simply ignored this evidence" was "arbitrary, capricious and an abuse of discretion").

Instead, PAB's assertion that the proposed mosque would have adverse parking and traffic effects was predicated on vague allusions to "testimony" from Town residents regarding MOLI's current buildings.  But "[s]ince the comments submitted to the Planning Board were uncorroborated by empirical evidence or expert opinion, they were insufficient to counter the compelling evidence submitted by the petitioner's [and Town's consultants] in support of site-plan approval." *Ernalex Constr. Realty Corp. v. Bellissimo*, 681 N.Y.S.2d 298, 300 (2d Dep't 1998).  Thus, apart from legally inadequate "suspicion," *Green Materials of Westchester v. Town of Cortlandt*, 18 N.Y.S.3d 114, 116 (2d Dep't 2015), there was "simply no evidence in the record to support [PAB's] determination that approval of [MOLI's] site plan would have a detrimental effect on traffic conditions or community services in the [Town]," *J&R Esposito Builders, Inc. v. Coffman*, 584 N.Y.S.2d 73, 74 (2d Dep't 1992).

PAB's purported concern for community character was equally infirm.  To support that rationale, PAB relied on a misinterpretation of a resident's testimony regarding traffic associated with a nearby daycare center and church.  *See McDonagh v. Ambach*, 528 N.Y.S.2d 730, 732 (3d Dep't 1988) (explaining a decision "will be overturned as arbitrary and capricious if the Department has … misread the record").  PAB also asserted "[a]lmost all the testimony received indicates that the existing place of worship already poses a negative impact on the surrounding

26

neighbors." Denial at 4. Yet PAB did not acknowledge, let alone address, the testimony regarding MOLI's *positive* impact on the community. *See Lidakis*, 899 N.Y.S.2d at 822. In any event, such "generalized community opposition" is not a valid basis for a land-use determination. *Bagga v. Stanco*, 934 N.Y.S.2d 493, 495 (2d Dep't 2011).

Those community character concerns were also inconsistent with the Town's zoning code. Places of worship are permitted in the Town's General Business district, where MOLI's property is located. Ex. 7 at 9. "The classification of a particular use as permitted in a zoning district is tantamount to a legislative finding that the permitted use … *will not adversely affect the neighborhood*." *Twin Cnty. Recycling Corp. v. Yevoli*, 688 N.E.2d 501, 502 (N.Y. 1997) (emphasis added) (internal quotation marks omitted). Accordingly, "where a zoning resolution permits [a land use] in a particular neighborhood, denial of a petition to operate such [use] must be based on more than community resistance to be rational." *Weprin v. Council of the City of N.Y.*, 835 N.Y.S.2d 849, 851 (Sup. Ct. 2007). Neither PAB's "conclusory statements" regarding community character, nor its objections that the area around MOLI is "basically [a] residential neighborhood" satisfy that requirement, so PAB's community character rationale lends no support to its denial. *Id.* at 852.

Finally, PAB "suggested no measures that would have accommodated the proposed religious use while mitigating the adverse effects on the surrounding community." *Capriola*, 900 N.Y.S.2d at 756. *Plaintiffs* proposed voluntarily capping the new building's occupancy, but PAB simply rejected their offer. *See id.* A New York court held it "arbitrary and capricious" when another Long Island town "failed to suggest any measures to accommodate [a mosque's] proposed site plan" and instead "unconditionally denied" it, particularly because the mosque had "represented the efforts it was willing to undertake to mitigate the negative impact caused by

parking and congestion on residential streets." *Hillside Islamic Ctr. v. Desena*, Case No. 603335/2024 (Sup. Ct. Jan. 15, 2024) (NYSECF No. 131. at 8).  PAB's strikingly similar failure to accommodate MOLI was equally "arbitrary, capricious, and an abuse of discretion." *Genesis*, 617 N.Y.S.2d at 203.  As a result, PAB's denial was invalid, and Defendants should "grant site plan approval forthwith." *J&R Esposito*, 584 N.Y.S.2d at 73.

## II.    Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

Irreparable harm "necessarily results when the State unconstitutionally burdens religious exercise." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021).  That principle applies to Plaintiffs' RLUIPA claims too.  *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 80 (2d Cir. 2021); *Tripathy v. Lockwood*, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022).

Defendants' "violation[s] of [Plaintiffs'] religious liberties" amply "satisfy the irreparable injury standard." *Green Haven*, 16 F.4th at 80.  The hardships Defendants are inflicting on Plaintiffs illustrate that principle:  The lack of classroom space requires MOLI to maintain a waitlist for its courses and turn away scores of young Muslims who want to learn about their faith.  Makda Decl. ¶ 19.  The insufficient number of wudu stalls for MOLI's congregants creates long lines, causing congregants to arrive late to prayer services or miss them altogether. *Id.* ¶ 23.  And the absence of a private space to confide in the imam chills congregants from receiving spiritual guidance on their most personal problems.  *Id.* ¶ 24.  Thus, there is "abundant evidence of ongoing harm to [Plaintiffs'] religious practice." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 296 (5th Cir. 2012).

## III.    The Public Interest Favors a Preliminary Injunction

An injunction preventing Defendants' from discriminating against Plaintiffs and permitting the construction of the proposed mosque is also firmly in the public interest.  "No

public interest is served by maintaining an unconstitutional policy" that infringes on religious liberty, *Agudath*, 983 F.3d at 637, and "[t]his principle applies equally to injunctions protecting RLUIPA rights," *Canton*, 377 F. Supp. 3d at 167 (citation omitted); *see also Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1231 (C.D. Cal. 2002) ("RLUIPA alone establishes that the public interest is strongly in favor of granting the injunction here.").

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an injunction (i) requiring Defendants to approve MOLI's application to construct a mosque capable of meeting the needs of its congregants and (ii) prohibiting Defendants from applying Local Law No. 6 in that process.

Dated:  January 24, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

By: */s/Muhammad U. Faridi*
    Muhammad U. Faridi
    Diana M. Conner
    Jacob I. Chefitz
    Jonah Wacholder
    Peter Vogel
    Nadav D. Ben Zur
    Shaun L. Carr
    PATTERSON BELKNAP WEBB & TYLER LLP
    1133 Avenue of the Americas
    New York, New York 10036
    Telephone No.:  (212) 336-2000
    Facsimile No.:  (212) 336-2222

    *Attorneys for Plaintiffs*

</div>

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiffs hereby certifies that this brief contains 8,651 words, which complies with the word limit of Local Rule 7.1(c).

Dated:  January 24, 2025

Respectfully submitted,

By: */s/Muhammad U. Faridi*
  Muhammad U. Faridi
  Diana M. Conner
  Jacob I. Chefitz
  Jonah Wacholder
  Peter Vogel
  Nadav D. Ben Zur
  Shaun L. Carr
  **PATTERSON BELKNAP WEBB & TYLER LLP**
  1133 Avenue of the Americas
  New York, New York 10036
  Telephone No.:  (212) 336-2000
  Facsimile No.:  (212) 336-2222

  *Attorneys for Plaintiffs*

30