UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

MUSLIMS ON LONG ISLAND, INC., IMRAN
MAKDA, and MOEEN QURESHI,

     *Plaintiffs*,

     *v*.

THE TOWN OF OYSTER BAY,

     *Defendant*.

**AMENDED COMPLAINT**

**CASE 2:25-CV-00428-SJB-JMW**

# TABLE OF CONTENTS

PAGE

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE ...............................................................................7

THE PARTIES..........................................................................................................7

    **A.**    Plaintiff Muslims on Long Island, Inc. ..................................................7

    **B.**    Plaintiff Imran Makda ............................................................................8

    **C.**    Plaintiff Moeen Qureshi .........................................................................8

    **D.**    Defendant Town of Oyster Bay ..............................................................8

    **E.**    The Individual Defendants.......................................................................8

OVERVIEW OF APPLICABLE LAW......................................................................8

    **A.**    The Religious Land Use and Institutionalized Persons Act....................9

    **B.**    The U.S. Constitution's First and Fourteenth Amendments and the New York Constitution...............................................................................11

    **C.**    Article 78 of the CPLR .........................................................................11

THE FACTS ...........................................................................................................12

    **A.**    MOLI Provides Important Religious and Community Services.............12

    **B.**    MOLI and Other Mosques on Long Island Have Been Targeted for Discriminatory Treatment......................................................................17

    **C.**    MOLI Currently Lacks an Adequate Facility to Meet Its Congregants' Religious Needs ...................................................................................22

    **D.**    MOLI Submits Its Application for an Expanded Facility......................23

    **E.**    MOLI Overcomes Years of Costly Agency Review and Receives Several Necessary Approvals .............................................................................24

        **i.**    MOLI Clears DER's Yearslong Process....................................25

        **ii.**    MOLI Obtains Approval from DPW .........................................30

        **iii.**    MOLI Clears Other Municipal Processes..................................30

    **F.**    Defendants Adopt a Discriminatory Parking Ordinance Targeted at MOLI's Application...............................................................................31

i.      The Town Concludes that MOLI Satisfies the Parking Requirement ............................................................................................... 31

ii.     The Town Arbitrarily and Discriminatorily Amends Its Parking Ordinance ................................................................................................. 32

iii.    The Town Requires MOLI to Provide an Inordinate Number of Parking Spots ........................................................................................... 37

G.    An Islamophobic Pressure Campaign Launches to Derail MOLI's Application ............................................................................................. 39

H.    The Opposition Causes MOLI to Make Modifications to Its Site Plan ............. 44

I.     Succumbing to Pressure from Objectors, NCPC Recommends Denying MOLI's Application to "Send a Message" .............................................. 45

J.     Objectors Pressure PAB, Causing It to Delay a Vote on the Application ............ 47

K.    Under Pressure from Islamophobic Demands, PAB Denies MOLI's Application ............................................................................................. 51

i.      PAB Cites Debunked Parking and Traffic Concerns .................................. 53

ii.     PAB Cites the Amorphous Concept of Community Character ................. 55

L.     Defendants and Nassau County Have Stonewalled Plaintiffs' FOIL Requests and Retaliated Against MOLI For Exercising Its Rights ...................... 58

M.    Impact on Interstate Commerce ........................................................................... 59

N.    Fact Discovery Affirms Plaintiffs' Claims and Exposes Additional Irregularities and Discriminatory Conduct by the Town ...................................... 60

PRAYER FOR RELIEF ............................................................................................... 89

## TABLE OF FIGURES

**PAGE**

Figure 1: Location of Mosques near Bethpage, NY ................................................................... 13

Figure 2: MOLI's Current Buildings ......................................................................................... 24

Figure 3: Rendering of MOLI's Property Under Plans Rejected by the Town ........................... 24

Plaintiffs Muslims on Long Island, Inc. ("MOLI"), Imran Makda, and Moeen Qureshi, through their attorneys, make the following allegations against Defendants Town of Oyster Bay (the "Town"), Scott Byrne, James Castellane, Clifford Chabina, Anthony DiLeonardo, Angelo Stanco, and Louis Warner (together, the "Individual Defendants," and collectively with the Town, the "Defendants")[1]:

## INTRODUCTION

1.      This lawsuit is brought to seek redress for unimaginable bigotry perpetuated against a small Muslim community in the hamlet of Bethpage, located in the heart of Long Island.  For over six years, MOLI and the Muslim community of Bethpage have been trying to upgrade their modest mosque into a modern house of worship capable of meeting the spiritual needs of their congregation.  The Town had different plans.  It first subjected MOLI to an unprecedent level of scrutiny and resistance not faced by other religious and secular organizations, imposing arbitrary and onerous demands that delayed the process by years.  The Town even revised its parking ordinance to facially discriminate against houses of worship—and more specifically, MOLI.  The bizarre and nightmarishly illogical nature of the process would have made Kafka himself raise an eyebrow.  MOLI nonetheless jumped through every one of the Town's hoops, but, in the end, it didn't matter.  The local community did not want the mosque to be built, so it embarked on a bigoted campaign to pressure local officials and the Town to reject MOLI's application.  The Town readily succumbed.  This lawsuit seeks redress for these blatant violations of MOLI's fundamental rights.

---

[1] This Amended Complaint is exactly the same as the Complaint filed in this action on January 24, 2025, but for the addition of Section N in the Fact section (paragraphs 194–239), the Thirteenth and Fourteenth Causes of Action (paragraphs 318–337), Prayer for Relief item g) and this footnote.  For the avoidance of doubt, Plaintiffs have dismissed their claims against the Individual Defendants and have thus modified the caption.

2. MOLI's ordeal started more than six years ago, in the summer of 2018, when it first submitted a plan to the Town to build a new mosque on its existing property in Bethpage. The property currently comprises two unconnected structures spread across two adjoining parcels of land. The two structures are simply inadequate to meet the needs of MOLI's congregation, and an upgrade is direly needed. For example, there is not enough space for the mosque's religious classes—a key component of the mosque's religious activity. Nor is there enough space for the ritual washing required of Muslims before prayer, or for the local Muslim community to gather to break their fast during the Islamic month of Ramadan.

3. Thus, in 2018, MOLI submitted a site plan application to the Town to replace its existing structures with a single new building better designed to meet the religious needs of its congregation. The labyrinthine nature of the local land use process requires applicants to navigate a multi-layer bureaucracy. MOLI's application met resistance at every turn.

4. The first set of roadblocks came from the Town's Department of Environmental Resources ("DER"), which subjected MOLI to a protracted and expensive regulatory review. During that process, DER hired outside consultants and required MOLI to pay their fees, creating a perverse incentive for DER's vendors to drag out the review. With MOLI footing the bill, DER and its consultants applied unusual scrutiny to the application, repeatedly forcing MOLI to re-submit its application to address the most trivial of issues. An example: DER required MOLI to re-submit its application because it had used the wrong acronym for the Town of Oyster Bay— "TUB" instead of "TOB." Another example: DER required a new application because it did not like the particular type of shrubs (creeping juniper) that MOLI intended to plant on its site. The result: years of submissions and re-submissions, costing MOLI significant amounts.

5.	But MOLI overcame every roadblock DER erected.  Five years after filing its initial application, in August 2023, MOLI finally secured DER's approval.  In granting its approval, DER concluded that MOLI's application would have no adverse impact on the environment, traffic and transportation, public health and safety, or even on the neighborhood's aesthetics and community character.

6.	In the meantime, while the DER process was ongoing, the Town put up another roadblock—this time focused on parking.  At the time MOLI submitted its initial application, the Town's longstanding ordinance required houses of worship to have at least one parking spot for every three *seats*.  But while MOLI's application was advancing, the Town changed the rules by passing a new parking ordinance, Local Law No. 6, that requires new houses of worship to have one parking spot for every three *occupants*.  Under the new ordinance, secular land use applicants—e.g., theaters—receive better treatment than religious land use applicants as they are still only required to have one parking spot for every three seats.

7.	The difference between seats and occupants is consequential.  A building's maximum occupancy is generally much greater than its number of seats, so an occupancy-based parking requirement will be more onerous than a requirement that is seat-based.  And that was certainly the case for MOLI.  Under the original ordinance, MOLI's proposed mosque needed a minimum of 86 parking spots—a number that MOLI's proposal satisfied.  But under Local Law No. 6, MOLI would need 155 parking spots, far beyond what its property can accommodate.

8.	Because of Local Law No. 6, MOLI had no choice but to seek a parking variance from the Town's Zoning Board of Appeals.  But MOLI was not even given a chance to do that.  An applicant can only proceed to the Zoning Board of Appeals after receiving site plan approval from the Town's Planning Advisory Board ("PAB").  Notwithstanding the "Advisory" in its

name, approval from PAB is a requirement. And before PAB can consider an application, it must be reviewed by the Nassau County Planning Commission ("NCPC"). NCPC does not have final authority over land use proposals in the Town. That authority rests with PAB. Still, NCPC's vote on a site application has weight: an application that receives a negative vote from NCPC must receive approval from a supermajority of PAB to proceed.

9. Once local residents got wind of MOLI's plans for a new mosque, they began pressuring local officials at both NCPC and PAB to kill the application. Residents inundated social media and the inboxes of elected officials—particularly Nassau County Legislator Rose Marie Walker—with messages opposing the mosque. One resident wrote: "Does anybody remember that there were two towers in Manhattan or did people forget and now we're asked to put a place like this in downtown [B]ethpage really?!" Another stated: "[A] Mosque, why? Are we going to give in and give up our neighborhood?" And another wrote: "How many mega mosques do these egomaniacs need?" These are just a few examples.

10. Responsible leadership mandates standing up to bullies and bigotry. Ms. Walker fell short. She urged NCPC to vote against MOLI's application. She even showed up at its meetings to advocate against the mosque—notwithstanding that she is a legislator in a different body and not a member of NCPC.

11. NCPC was more than happy to oblige Ms. Walker's entreaties, voting five-to-one on July 18, 2024 to recommend to PAB that MOLI's application be denied. One of its commissioners, Reid Sakowich, declared that the application must be denied because congregants of another mosque in a different town fifteen miles away allegedly clog up the streets with traffic. It did not matter to NCPC that multiple agencies and experts had studied the

potential impact of MOLI's application and concluded that no additional traffic would be generated by the new mosque.

12. A few hours after NCPC's vote, PAB held a public hearing on MOLI's application. While hundreds of community members attended the hearing to advocate *for* the mosque, PAB had ears only for a smaller group, including Ms. Walker, that assembled to oppose it. After hearing the opponents' baseless and bigoted objections, PAB decided to sit on MOLI's application for an unusual amount of time—four months—without issuing a decision. Justice was delayed. And then it was denied. On November 14, 2024, PAB voted unanimously to deny MOLI's application—PAB's *only* denial of a site plan application since 2018. That was followed by a written decision on December 26, 2024.[2] As a result of PAB's decision, MOLI's application cannot move forward.

13. Despite spending the weeks between November 14 and December 26 searching for a basis to justify its denial, PAB's written decision has all the hallmarks of discrimination and arbitrariness.

14. The decision first claims that the application did not provide enough parking. Never mind that the application complied with the parking ordinance that was in place when it was originally filed, and that DER and others had already concluded the application would not create new parking issues. PAB simply ignored the agencies' studies and conclusions, instead relying on unfounded complaints from objectors. PAB also ignored its longstanding practice of

---

[2] As explained further below, PAB's delay in ruling on MOLI's application violated New York law in several respects. First, New York law required PAB to render a decision on MOLI's application within sixty-two days of the July 18, 2024 hearing. *See* N.Y. Town Law § 274-a (8). But PAB did not render its decision for 119 days. Second, New York law required a written decision within five business days of the November 14, 2024 vote. *Id.* But PAB did not issue its written decision until December 26, 2024.

approving applications—conditioned on obtaining any required zoning variances—that comply with its site plan approval requirements. Simply put, Bethpage's Muslim community was not given the benefits afforded to others.

15. The written decision then claimed that mosque-related traffic was a danger to the community and that a new mosque was somehow inconsistent with the "suburban" community character of Bethpage. But each of these concerns had already been studied and rejected by the Town and Nassau County agencies tasked with evaluating them.

16. Calling PAB's grounds for denial pretextual would be an understatement. Indeed, PAB could barely hide the discriminatory nature of its decision. Its written denial explicitly acknowledged that it had previously permitted "many non-conforming non-residential uses that do impose a negative impact on the surrounding properties that frequently generate complaints from neighbors" but that, "[m]oving forward," *i.e.*, in the case of MOLI, such uses "must be held to a minimum."

17. In the end, the denial of MOLI's application to build a modest house of worship was a win for bigotry. It did not matter how many times MOLI revised its plans to address the Town's baseless concerns. The Town simply could not tolerate the idea of a new mosque.

18. Ironically, MOLI's proposed mosque is just a few miles from Eisenhower Park. Its namesake, President Dwight D. Eisenhower, once told Muslims at another mosque: "I should like to assure you, my Islamic friends, that under the American Constitution, under American tradition, and in American hearts, this Center, this place of worship, is just as welcome as could be a similar edifice of any other religion. Indeed, America would fight with her whole strength for your right to have here your own church and worship according to your own conscience.

This concept is indeed a part of America, and without that concept we would be something else than what we are."

19.     That is the promise of America and its laws.  After six years of failing to convince the Town to honor that promise, Plaintiffs now turn to the Court to enforce it.  Religious liberty and equal protection are for everyone—even Muslims.

## JURISDICTION AND VENUE

20.     Plaintiffs' federal claims arise under 42 U.S.C. § 2000cc and 42 U.S.C. § 1983. This Court therefore has subject matter jurisdiction over those claims action under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same set of facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

21.     This Court has personal jurisdiction over Defendants because Defendants are located in in this District and because the acts complained of occurred in this District.

22.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in the Town of Oyster Bay, which is located within the Eastern District of New York.

## THE PARTIES

### A.     Plaintiff Muslims on Long Island, Inc.

23.     Plaintiff MOLI is a not-for-profit religious congregation organized under the laws of New York, with an address of 320 Central Avenue, Bethpage New York, 11714.  MOLI's mission is to provide for the spiritual and religious needs of the Muslim community in Bethpage by providing facilities for religious worship and education.  MOLI endeavors to also provide for the spiritual and social well-being of the local community through youth activities, family and

personal counseling, volunteering for the needy, participating in interfaith dialogues, and other activities, including a regular weekend community breakfast that MOLI hosts for everyone in the community, including non-Muslims.

**B.  Plaintiff Imran Makda**

24.  Plaintiff Imran Makda is a member of MOLI's Board of Trustees and has been attending the mosque at least weekly since 2001.  He is involved in MOLI's operations, including leading its efforts to update its mosque.  Mr. Makda has resided in Plainview, New York since 2001 and is a partner at a prominent accounting firm.

**C.  Plaintiff Moeen Qureshi**

25.  Plaintiff Moeen Qureshi has been attending the mosque regularly since 2015.  He serves on MOLI's construction committee and has worked alongside Mr. Makda to obtain approval from the Town to update MOLI's mosque.  Mr. Qureshi has resided in Bethpage for nine years and works in the area of compliance at a prominent organization.

**D.  Defendant Town of Oyster Bay**

26.  Defendant Town of Oyster Bay is a township in Nassau County, New York.

**E.  The Individual Defendants**

27.  Defendant Angelo Stanco is the chair of PAB.

28.  Defendants Scott Byrne, Clifford Chabina, Anthony DiLeonardo, James Castellane, and Louis Warner are members of PAB.

29.  Defendants Angelo Stanco, Scott Byrne, James Castellane, Clifford Chabina, Anthony DiLeonardo, and Louis Warner are sued in their official capacities.

**OVERVIEW OF APPLICABLE LAW**

30.  Plaintiffs bring this action to enforce their rights under the Religious Land Use and Institutional Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, the First and Fourteenth

Amendments to the U.S. Constitution, the New York State Constitution, and Article 78 of the New York Civil Practice Law and Rules ("CPLR").

## A.      The Religious Land Use and Institutionalized Persons Act

31.      RLUIPA was unanimously passed by the U.S. Congress and signed into law on September 22, 2000. Congress passed RLUIPA after three years of hearings, which, according to its lead Senate sponsors, Senators Orrin Hatch and Edward Kennedy, revealed "massive evidence" of widespread discrimination against religious persons and organizations by state and local officials in land use decisions.[3] The hearing record indicated frequent discrimination both "on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation."[4] Discrimination was evident both "against churches as compared to secular places of assembly" and "against small and unfamiliar denominations as compared to larger and more familiar ones."[5] As the House report found, "[t]he motive is not always easily discernible, but the result is a consistent, widespread pattern of political and governmental resistance to a core feature of religious exercise: the ability to assemble for worship."[6] Congress found that local zoning ordinances often place the ability of religious groups to assemble for worship "within the complete discretion of land use regulators," who often have "virtually unlimited discretion in granting or denying permits for land use and in other aspects of implementing zoning laws."[7] RLUIPA's Senate sponsors also observed that houses of worship "cannot

---

[3] *See* 146 Cong. Rec. 16698 (2000) (Joint Statement of Senators Hatch and Kennedy); *see also* H.R. Rep. No. 106-219, 18-24 (1999).

[4] 146 Cong. Rec. at 16698.

[5] *Id*. at 16699.

[6] H.R. Rep. No. 106-219, at 24; *see also* 146 Cong. Rec. S7774 (daily ed. July 27, 2000).

[7] H.R. Rep. No. 106-219, at 19-20.

function without a physical space adequate to their needs and consistent with their theological requirements."[8]

32.    RLUIPA complements the protections endowed on religious exercise by the First Amendment by prohibiting, in relevant part, four types of conduct in the imposition and implementation of land use regulations. First, RLUIPA prohibits the implementation of land use regulations in a manner that imposes a substantial burden on the religious exercise of a person or religious institution, in the absence of a compelling state interest achieved by the least restrictive means.[9] Second, RLUIPA prohibits the imposition or implementation of any land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.[10] Third, RLUIPA prohibits discrimination on the basis of religion in the imposition or implementation of any land use regulation.[11] Fourth, RLUIPA prohibits the imposition or implementation of a land use regulation in a manner that totally excludes or unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.[12]

33.    RLUIPA provides that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."[13] Additionally, pursuant to 42 U.S.C. § 1988(b), prevailing plaintiffs under RLUIPA are eligible for an award of attorneys' fees.

---

[8] 146 Cong. Rec. S7774.

[9] 42 U.S.C. § 2000cc(a).

[10] *Id*. at § 2000cc(b)(1).

[11] *Id*. at § 2000cc(b)(2).

[12] *Id*. at § 2000cc(b)(3).

[13] *Id.* at § 2000cc-3(g).

**B.** **The U.S. Constitution's First and Fourteenth Amendments and the New York Constitution**

34.     The First Amendment to the U.S. Constitution prohibits state and local governments from taking any action that unduly infringes on the free exercise of religion.  The Free Exercise Clause of the First Amendment limits enforcement of laws that impose a substantial burden on the exercise of sincerely held religious beliefs.  The Supreme Court recently clarified that laws or regulations that "treat *any* comparable secular activity more favorably than religious exercise" are disfavored under the Free Exercise Clause.[14]

35.     The Fourteenth Amendment guarantees "the equal protection of the laws" to all individuals.  The Equal Protection Clause of the Fourteenth Amendment limits a state or local government's ability to distinguish individuals or groups on the basis of, among other things, religion.

36.     The New York Constitution provides protections that overlap with and complement those guaranteed by the U.S. Constitution.  Given New York State's centuries' long tradition of celebrating and protecting religious freedom, the Free Exercise Clause of the New York Constitution has been interpreted to be even "'more protective of religious exercise' than its federal counterpart."[15]

**C.** **Article 78 of the CPLR**

37.     Under Article 78 of the CPLR, courts review the decisions of government bodies to ensure their determinations are not "arbitrary and capricious," an "abuse of discretion," or

---

[14] *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in the original).

[15] *Clark v. City of New York*, 560 F. Supp. 3d 732, 743–44 (S.D.N.Y. 2021) (quoting *Catholic Charities of the Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006)); *see also Smith v. Donahue*, 195 N.Y.S. 715, 718 (3rd Dep't 1922) ("The State has ever been zealous, since its organization, to protect against appearance of an encroachment upon the right of free worship of God as the conscience of the citizens may choose and direct.").

"affected by an error of law."[16] Because government action must have "a rational basis," a decision is arbitrary—and thus invalid—if it is "without sound basis in reason" or "taken without regard to the facts."[17] Land-use decisions "based upon generalized community opposition,"[18] or mere "rumor and suspicion,"[19] are therefore unlawful. Article 78 thus requires governmental bodies to act rationally and to ground their decisions in the bedrock of fact, rather than the quicksand of community sentiment.

38. Courts strictly enforce these requirements when land use authorities render decisions regarding houses of worship. When local authorities evaluate religious uses, "every effort to accommodate [religious practice] must be made."[20] Indeed, the government "is required to suggest measures to accommodate the proposed religious use while mitigating the adverse effects on the surrounding community to the greatest extent possible."[21] Failure to accommodate a proposed religious use in this manner renders a decision "arbitrary, capricious, and an abuse of discretion" under Article 78.[22]

## THE FACTS

### A. MOLI Provides Important Religious and Community Services

39. MOLI established its mosque on Central Avenue in Bethpage in 1998.

---

[16] N.Y. C.P.L.R. § 7803(3).

[17] *Pell v. Bd. of Ed. of Union Free Sch. Dist. No. 1*, 313 N.E.2d 321, 325 (N.Y. 1974).

[18] *Bagga v. Stanco*, 934 N.Y.S.2d 493, 495 (2d Dep't 2011).

[19] *Green Materials of Westchester v. Town of Cortlandt*, 18 N.Y.S.3d 114, 116 (2d Dep't 2015).

[20] *Gospel Faith Mission Int'l, Inc. v. Weiss*, 977 N.Y.S.2d 333, 335 (2d Dep't 2013) (quoting *Genesis Assembly of God v. Davies*, 617 N.Y.S.2d 202, 203 (2d Dep't 1994)).

[21] *Capriola v. Wright*, 900 N.Y.S.2d 754, 756 (2d Dep't 2010) (internal quotation marks omitted).

[22] *Genesis Assembly of God*, 617 N.Y.S.2d at 203.

40.     As set forth in Figure 1 below, the mosque—also known as Masjid Al-Baqi—is the only mosque in its immediate area. While there are a handful of other mosques in other hamlets in the surrounding vicinity, MOLI primarily serves—and will continue to primarily serve—congregants from Bethpage and its immediate vicinity.



**Figure 1: Location of mosques near Bethpage, NY, with Plaintiffs' mosque (pin number 4) appearing in blue**

41.     The mosque is located in a mixed commercial and residential area.  It is surrounded by private homes and many local businesses, including a gas station, a smoke shop, a plumber, and a psychic.  It is also not the only house of worship in the neighborhood; several churches are located just blocks from MOLI (the closest of which provides no parking).

42.     When MOLI purchased its property in the 1990s, it had been vacant for years, owned by an out-of-business restaurant. The site, and particularly its large, derelict parking lot, had become a meeting place for local drug users to gather to consume their wares. The property's most immediate neighbors, eager to see a religious institution replace the local eyesore, welcomed MOLI's arrival.

43.     Since then, MOLI has worked to serve its congregants and its neighbors by offering a broad variety of religious and community services.

44.     **Worship**. The Islamic faith places substantial value in mosques. Each mosque is considered to be a house of God—a sacred space dedicated to prayer where congregants come together to share their common faith. Muslims are required to pray five times a day, preferably in a mosque, with each prayer lasting five to twenty minutes. The Friday afternoon prayer service, referred to as Jumma, is the most important service of the week. During Jumma, members of the community congregate to listen to a sermon delivered by an imam, the leader of the Muslim congregation, who leads the prayer services and addresses the congregation's spiritual needs. Muslims also come to the mosque for various other special prayer services, such as evening prayers during the Islamic holy month of Ramadan, prayers on Islamic holidays, and funeral prayers.

45.     MOLI hosts five daily prayers, most of which are attended by a few dozen parishioners. Friday—Islam's weekly holy day—is MOLI's busiest day of the week. Each Friday, several hundred individuals attend Jumma. To handle the increased attendance on Fridays and to minimize traffic and parking difficulties, MOLI hosts four prayer services each Friday afternoon, spaced out to allow for proper ingress and egress into its parking lots.

46.     MOLI's regularly scheduled prayer services expand during Ramadan to include additional services, including a nightly meal to break the daily fast and an evening prayer (known as Taraweih).

47.     As a matter of practical and religious necessity, these prayer services require adequate space.  During their prayers, worshipers must sit on prayer rugs—themselves a type of seat—and face toward Mecca, Saudi Arabia.  They must also be able to see and hear the imam leading the prayers and, prior to praying, must cleanse their faces, arms, and feet in clean water drawn from specially designed wash basins in a ritual called wudu.  These religious requirements, combined with the healthy size of MOLI's congregation, means that MOLI requires a meaningful physical space for its members to pray.

48.     Moreover, because buildings designed for other uses generally lack the layout and facilities necessary to operate a mosque consistent with Islamic tenets, Muslim congregations searching for dedicated places to pray—like MOLI—cannot easily rent or purchase preexisting buildings originally designed for other uses to operate as mosques.

49.     **Education and Pastoral Care**.  In addition to offering a sacred, dedicated space to pray, MOLI also provides religious education.  Children in the congregation can attend daily after-school programs and Saturday school, during which they learn Arabic and the tenets of the Islamic holy book, the Quran, while also socializing and playing with their friends.  Generally, after-school courses draw around 150 students while classes on Saturday draw around 100.  Particularly devout or scholarly children can also attend Hifz classes, where they work to memorize the Quran.  MOLI's educational opportunities are not limited to children; it provides religious educational programming for adults as well.  MOLI also provides an array of pastoral

services to its congregants, including personal and family counseling provided by MOLI's imams.

50. **Community Services.** Islam teaches that the faithful should be good neighbors. MOLI therefore complements its core religious offerings with a commitment to community service. MOLI takes this duty seriously. It hosts frequent community service events, including food drives and regular, free community breakfasts on the weekend that all are welcome to attend, regardless of faith.

51. In accordance with the teachings of Islam, MOLI is particularly focused on caring for the poor and hungry. For example, it has operated a food pantry for the needy of Nassau County and, during the COVID-19 pandemic, it created a free grocery delivery service, delivering food to dozens of Bethpage families regardless of their religion. Parishioners in need of financial assistance can also apply to MOLI for one-time or recurring financial support.

52. MOLI also believes being a good neighbor requires community building. It hosts interfaith events with other houses of worship in the area, encourages its members to volunteer at local charities and to support local businesses, and sponsors communitywide events, including a trip to Adventureland in East Farmingdale (to which all Bethpage community members regardless of faith are invited); a charity fundraiser where children in the congregation under the age of twelve wash cars; nutrition lessons; strength training classes for elderly parishioners; a women's jiu-jitsu class; painting lessons for mothers and daughters; and a ping-pong tournament.

53. In short, in the more than two decades since MOLI founded its mosque on the site of an abandoned, drug infested restaurant, the mosque has blossomed into a dynamic house of worship and an excellent neighbor.

54. Even many of the opponents of MOLI's planned expansion have recognized that MOLI has been an excellent neighbor. For instance, one neighbor, Joseph Driscoll, testified in 2024 that he lived "directly behind the mosque"; had "enjoyed a mutually respectful relationship with [it] for 25 years"; and that the minor inconveniences posed by living next to it were "nothing compared to the issues that [he] faced" with the restaurant the mosque replaced. Despite opposing the mosque's application to expand its facility, he admitted that he was "very happy to be the mosque's neighbor."

## B. MOLI and Other Mosques on Long Island Have Been Targeted for Discriminatory Treatment

55. Despite its decades-long good standing in the community, MOLI has not been accepted by many residents of Oyster Bay, or even by its government.

56. Like many Muslim communities in the United States, Muslims in Oyster Bay have experienced threats and harassment. Not long after the September 11, 2001 terrorist attacks, a vandal destroyed the mosque's welcome sign. The mosque called the Nassau County Police, who arrived and apprehended the vandal but declined to arrest him.

57. Such incidents have unfortunately persisted. To this day, the mosque's Friday prayer services are regularly interrupted by hecklers yelling slurs like "go home!" or "terrorists!". On one occasion during Ramadan, a motorcyclist arrived in the mosque's parking lot to rev his engine and yell obscenities at terrified congregants who had gathered outside to break their Ramadan fast. After the mosque's private security guards (who the mosque must hire during Ramadan to ensure the safety of congregants) and volunteers physically blocked the man from driving through the parking lot, he fled. Again, MOLI reported the incident to the Nassau County Police. And again, they refused to take any action, including reviewing available footage

17

from the mosque's security cameras. Instead, they speculated to the congregants that perhaps the man just wanted to show off his motorcycle.

58. The mosque also endured years of regular trespassing from a local landscaping man who would park his truck on Central Avenue—blocking traffic—and then plant small American flags all over the mosque's property while screaming "terrorists!".

59. These incidents are, if anything, accelerating over time. For instance, in 2024, a worshiper parked his car legally on the street to attend a prayer service and returned to it shortly thereafter to find it vandalized.

60. Beyond turning a blind eye to these hate crimes, the Town also has a history of succumbing to public demands to discriminate against the mosque.

61. On July 28, 2010, a member of the Bethpage community sent a mass email to his fellow residents criticizing a proposal to build another mosque in Bethpage.[23] He urged "the Bethpage community to get together and send a message to our public officials that we do not want this." He went on: "This is not a Muslim neighborhood; we have no Muslim congregation in Bethpage." He asserted that "many of these organizations are on the FBI watch lists" and, using all caps and bold, he declared: "**I DO NOT WANT THIS IN MY NEIGHBORHOOD. THEY NEED TO GO ELSE WHERE. THIS IS THE MESSAGE WE NEED TO SEND**."

62. The email then turned to MOLI, asserting that it had "opened without a word and now there are rumors that they are expanding." The email "attached an article on how people stopped mosques from going up in a Catholic neighborhood in Staten Island, Brooklyn and the World Trade Center site." And it encouraged Bethpage residents to complain to Ms. Walker, the

---

[23] A copy of this email is attached as Exhibit A to this Complaint.

Town of Oyster Bay's Town Supervisor, and other local politicians about both MOLI and the proposed new mosque, providing a pre-written message that could be copied and pasted.

63. Thereafter, Bethpage residents flooded the Town with messages expressing concerns about the proposed mosque and MOLI's mosque. Several demanded that the Town inspect MOLI. The Town acceded and performed a surprise inspection of the mosque. Pointing pretextually to purported safety issues and problems with MOLI's certificate of occupancy, the Town shut down the mosque on August 10, 2010, the eve of Ramadan. And it did so despite identifying no issues with the facility that posed an imminent danger.

64. At the time, Town officials openly confessed their motivations. Then Town Supervisor John Venditto (later convicted of corruption) acknowledged to *Newsday* "that Oyster Bay's building department sent an inspector to [the mosque] only after more than 100 residents called or e-mailed the town to complain about a proposal for a second mosque in Bethpage."[24] He admitted that the Town was intentionally targeting Muslims for heightened scrutiny, rationalizing "[i]t's fair to say that the proposed mosque brought attention to other mosques in the community[.]"[25] Frederick Ippolito—then Oyster Bay's Commissioner of Planning and Development (later convicted of tax evasion)—was similarly forthcoming. He told *Newsday* that the Town inspected the mosque even though the e-mails the Town received about the mosque "did not cite any evidence of code violations."[26]

65. The Town also cited the mosque for violating an ordinance passed just that year that required houses of worship to have at least one acre of land. The mosque at this time owned

---

[24] *See* Ex. B (Norman Merchant, *Bethpage Mosque Closed After Code Violation Complaints*, Newsday Aug. 13, 2010).

[25] *Id.*

[26] *Id.*

slightly less than an acre. The ordinance applied retroactively—itself highly unusual—but exempted houses of worship that were built more than ten years prior. Owing to demographic changes on Long Island, these grandfathered-in institutions were disproportionately churches. When the mosque sought protection under the grandfathering provision, noting that it had been operating from its current location since the late 1990s, the Town claimed that it had missed the cutoff for grandfathering by six months.

66. To resolve the Town's concerns, MOLI purchased a second building adjacent to its original parcel. The buildings remain separated and are served by two unconnected parking lots. The original structure currently serves as MOLI's main building while the second one provides overflow space.

67. The foregoing incidents of discrimination against MOLI played out against a broader backdrop of anti-Muslim hate on Long Island. Much of this hate has been directed specifically toward mosques or Islamic centers. For example, shortly after September 11, 2001, non-Muslim residents of East Meadow, New York—just down the road from Bethpage— organized to oppose a plan to build a new mosque. Many of the opponents made the basis of their opposition quite clear. As the *New York Times* summarized: "they were strongly opposed to the mosque because it's a mosque."[27] As one opponent of the East Meadows mosque told the *Times*: "They have a past history of being violent, and they have a current history of being violent too, and of having radical groups[.] I'm sure most of them are peace loving, but I'm thinking in the back of my head, 'Are they practicing a false religion?' You just don't know."[28]

---

[27] *See* Ex. C (Donna Kutt Nahas, *Is the Issue Parking or Prejudice?*, New York Times, Dec. 15, 2002, at LI 14).

[28] *Id.*

68.     And even when mosques and Islamic centers have been built on Long Island, they have been repeatedly vandalized.  From 2010 through 2022, mosques were vandalized in Huntington (2010), North New Hyde Park (2017), Brentwood (2021), Hicksville (2021), and Ronkonkoma (2022).  In Hicksville, for instance, one of the vandalizers threw garbage and human waste onto the front door of the mosque shortly before its Friday afternoon prayers.

69.     Oyster Bay's history of discriminating against MOLI is also sadly consistent with a Town practice of targeting other minority faiths for unequal treatment.  In 2016, the Guru Gobind Singh Sikh Center sued Oyster Bay, claiming that the Town used its land use regulations to unfairly target the construction and renovation of a Sikh temple.  *See Guru Gobind Singh Sikh Center Inc., v. Town of Oyster Bay*, 2-16-cv-03600 (E.D.N.Y. June 29, 2016).  In 2014, the Town had approved construction of a new Sikh temple.  But shortly after the old building was demolished and construction began on the new temple, local residents began to voice their opposition to the new temple.  In response to this growing opposition, the Town issued a stop work order in July 2015.  Only in January 2016, after negotiations between the Town's Commissioner of Planning and Development and representatives of the Temple over parking spaces, was the stop work order lifted.  Then, incredibly, less than one month after work restarted, the Town Board took the extraordinary step of adopting a resolution suspending the site plan approval issued to the temple.  This action contravened the Town's zoning ordinances and had no reasonable basis.  Only after the lawsuit was filed against the Town and various individuals in their official capacities was the matter settled under a Consent Order.

70.     Thus, as MOLI's own experience shows, and as the *Guru Gobind* saga further confirms, there is a streak of religious intolerance in Oyster Bay and the surrounding area, and a

track record of elected officials—often pressured by constituents—discriminating against minority religions on the basis of their faith.

## C.    MOLI Currently Lacks an Adequate Facility to Meet Its Congregants' Religious Needs

71.    Since 2010, MOLI's facility has comprised two buildings at 300 and 320 Central Avenue.  These buildings, however, are currently inadequate to meet the religious needs of the mosque's congregants in several respects.

72.    *First*, the current facility does not have enough space for the mosque's evening and Saturday school for children, where they receive Quranic lessons.  The buildings do not have classrooms—or any rooms—that can fit sufficient tables and chairs, or indeed space to store so many tables and chairs.  The evening school has therefore needed to set up makeshift classrooms in the main prayer area, with children sitting on the floor and curtains substituting for walls. MOLI also needs to maintain a long waitlist as the mosque does not have enough space to educate every young Muslim in the congregation that wishes to learn about their faith.

73.    *Second,* the facility does not have enough bathrooms.  Currently, the facility has only four bathroom stalls for the two buildings, and these must service around 200 congregants at peak times.  Moreover, around 150 children attend MOLI's evening school on a nightly basis, and four toilets is simply not enough to accommodate that many children.  Nor are the four bathroom stalls even close to sufficient to accommodate the hundreds of congregants who currently attend the mosque each Friday for Jumma services, and certainly not the many who attend during Ramadan.

74.    *Third*, the facility lacks adequate space for congregants to perform wudu.  Wudu requires stalls in which congregants can ritually wash their hands, arms, feet, and face, a process that takes about two minutes per person.  Currently, the facility does not have enough stalls to

accommodate the hundreds of congregants who visit the mosque each week, causing them to miss or be late for the group prayer led by the imam.

75.     *Fourth*, the facility lacks a private location for congregants to talk to the imam. Currently, a congregant who wishes to consult the imam for counseling must do so in a public space, such as the main prayer area or the corner of the parking lot.  This is unacceptable for many congregants, who often seek counseling from the imam on private issues.

76.     *Fifth*, aside from the main prayer area, the facility does not have a space for hosting religious meals (such as the evening iftar dinner that breaks Muslims' fast during Ramadan), community events, or youth activities.  MOLI thus needs to host such events in its main prayer area, even though Islam teaches that prayer areas should be sanctified spaces dedicated to worship.  The congregation's children also must play in the parking lot or in the main prayer area as there is nowhere else in the mosque for recreation.

## D.     MOLI Submits Its Application for an Expanded Facility

77.     To address the above inadequacies and better serve—not expand—its existing congregation, MOLI decided to seek Town approval of a plan that would demolish its two existing one-story buildings to construct a new, modern three-story building in their place.  The new building would include a slightly larger prayer room and would add new facilities the mosque currently lacks, including offices, a library, additional bathrooms and wudu stalls, and a basement-level multi-purpose room.  MOLI also planned several other site improvements, including new landscaping, asphalt pavement, curbing, sidewalks, exterior lighting, and drainage infrastructure.  MOLI's plan would also connect its two separate parking lots, so cars travelling between the two would no longer need to exit onto the public street.  Below is a picture of MOLI's current and planned facility:



**Figure 2: MOLI's current buildings, located at the corner of Stewart & Central Avenues, Bethpage, NY**



**Figure 3: Rendering of MOLI's property under plans rejected by the Town**

78.     In August 2018, MOLI submitted an application to the Town to obtain approval

of its site plan.

**E.      MOLI Overcomes Years of Costly Agency Review and Receives Several Necessary Approvals**

79.     To obtain approval for a land use application like MOLI's, several Town and

Nassau County entities generally must sign off on the proposed application.  One is the Town's

**Department of Environmental Resources** (abbreviated above as "**DER**"), which evaluates the application's potential environmental impact. Another is the **Nassau County Department of Public Works** ("**DPW**"), which must approve any construction plan that could impact county roads. Applications are also reviewed by the **Nassau County Planning Commission** (abbreviated above as "**NCPC**"), which is tasked with issuing recommendations regarding site plans to the Town of Oyster Bay's **Planning Advisory Board** (abbreviated above as "**PAB**"). While NCPC lacks the authority to grant or deny an application, if it recommends that PAB deny a site plan, the plan can only be approved by a super-majority of PAB (which normally requires a simple majority to approve a site plan). In turn, PAB has the power to either approve or deny site plans, or to issue a conditional approval directing the applicant to seek a variance from the Oyster Bay Zoning Board of Appeals, which can issue variances and exemptions from town zoning ordinances.

80. Following the initial submission of its site plan in August 2018, MOLI spent years—and tens of thousands of dollars—going through seemingly endless agency review. Despite burdensome delays and costs, MOLI eventually obtained key approvals for its project from DER, DPW, and several other agencies before running into a brick wall of community opposition and official discrimination.

     **i.**     **MOLI Clears DER's Yearslong Process**

81. From 2018 through 2023, the primary agency reviewing MOLI's application was DER. On October 17, 2019, DER's Deputy Commissioner, George Baptista Jr., provided the agency's first substantive feedback on MOLI's submission. Baptista instructed that DER "cannot resume [its] requisite review" until MOLI provided a laundry list of requested information, including explanations regarding how "the proposed action is consistent with

community character" and how MOLI would ensure no significant adverse impact on the Town's "suburban quality of life."

82. After MOLI updated its submission to DER, a yearslong process of comments and re-submissions ensued, with DER repeatedly identifying picayune issues that it required MOLI to address. In one response letter, for example, DER demanded that MOLI supplement its landscaping plan with additional landscaping for enhanced biodiversity and visual interest. When MOLI complied by agreeing to add a low-maintenance, salt-tolerant, creeping juniper to its site plan, DER responded that creeping juniper was "not a favored species" and demanded a different species of low-maintenance, salt-tolerant shrub, necessitating another revision to MOLI's application and yet more delay. On another occasion, DER demanded that MOLI submit a new application because MOLI's application used the acronym "TUB" to refer to the Town of Oyster Bay, rather than DER's allegedly preferred acronym, "TOB."

83. DER's protracted review did not just delay the project; it also imposed a significant financial burden on MOLI. Each new round of comments from DER required MOLI to pay its own architects and consultants to respond to and address each item that DER flagged. Between 2018 and 2024, MOLI's application-related expenses totaled approximately $313,329.54.

84. But that was not even the half of it. As soon as DER began reviewing MOLI's submission, the agency abruptly changed the long-established fee schedule that it charges applicants for review projects. A few weeks after providing his October 2019 feedback to MOLI, Baptista wrote a memo to the Town's Board asking it to amend Oyster Bay's fee schedule for DER's environmental assessment review. Baptista proposed that the Town start charging applicants $175 per hour for review projects performed by DER staff and for the full

cost of any outside consulting services retained by DER to assist with its review. In December 2019, the Town passed a resolution adopting Baptista's proposal.

85.     The curious timing of the Town's policy change indicates that it was intended to impose a burden on MOLI. And as a result of this change in policy, DER required MOLI to establish and repeatedly replenish a $10,000 trust fund to cover the costs of the agency's review of its application, including the costs of all fees charged by DER's retained consulting firms. In total, DER demanded that MOLI pay $45,000 simply to have its application reviewed. And that does not include the costs MOLI has incurred to pay its own consultants.

86.     DER's policy change, and the resulting costs to MOLI, imposed a significant burden. MOLI is a modest congregation, and many of its congregants are first- or second-generation immigrants working to make new lives in America. What might be pocket change for some has been a meaningful burden for MOLI.

87.     Still, despite the long delays and the significant costs, MOLI ultimately addressed every objection DER lodged against its site plan. And on August 25, 2023, DER issued a Town Environmental Quality Review Report concluding that the proposed mosque "will not result in significant adverse environmental impacts."[29] Among other things, DER determined that the proposal would have no significant adverse impacts with respect to "land use and zoning"; "air quality, odors, noise, and lighting"; "public health and safety"; and "aesthetic resources and community character."

88.     And as part of its review, DER also concluded that the proposed mosque "would not have a significant adverse impact on the traffic operations of the adjacent roadway network or transportation resources in the Town of Oyster Bay."

---

[29] A copy of DER's August 25, 2023 report is attached as Exhibit D to this Complaint.

89.     It further concluded that granting MOLI's application would actually "*improve traffic safety* by retaining vehicles on-site for travel between the two parking areas, eliminating one of the four existing driveways, and providing for more controlled access with additional signage (i.e., permitting only right turns for all ingress and egress movements to and from the site)."

90.     As DER explained in its August 25 report, "[a] comprehensive analysis was prepared to examine the potential impacts of the proposed action on transportation resources." This included a detailed traffic study and comment letter prepared by MOLI's consultants at R&M Engineering that specifically studied the project's potential impact on nearby streets. R&M concluded that "there is no anticipated increase in traffic or parking conditions associated with the project" and that "[n]o new traffic is anticipated to be generated by the site."

91.     As part of its analysis, R&M also obtained and submitted three years' worth of traffic safety data from the New York State Department of Transportation for the intersection where the mosque is located—Central and Stewart Avenues. That data showed that 34,032 vehicles crossed that intersection daily, with approximately 37.27 million vehicles entering the intersection over the course of three years. During that period, there were just 57 accidents at the intersection—primarily rear-ending and overtaking—11 of which resulted in injury and none of which caused a fatality or involved a pedestrian or cyclist. And no evidence has ever been presented suggesting that any of these incidents were caused by someone entering or exiting the mosque. Based on this data, R&M concluded that "there should be no[] issues with pedestrians crossing Central Avenue at Stewart Avenue to access the Mosque."

92.     Notwithstanding the conclusive evidence offered by R&M, DER insisted on hiring its own consultants (at MOLI's expense) from the firm L.K. McLean Associates

("LKMA") to also study the traffic impact of MOLI's proposal. Charging MOLI thousands more dollars, LKMA agreed with R&M's findings—the proposed mosque would not meaningfully increase traffic in the area. In an April 18, 2022 memorandum prepared at the Town's request, LKMA agreed with R&M that the proposed mosque was unlikely to result in an increase in traffic "since there are four mosques within five miles of the site, and no change to the size of the congregation is anticipated." LKMA further explained that even if there were a slight increase in traffic volumes, that was "not likely to result in detrimental impact on the adjacent roadways." LKMA therefore concluded "that no additional traffic w[ould] be generated by the proposed project."

93.     LKMA doubled down on this conclusion in a March 7, 2023 follow-up memorandum that it again prepared at the Town's request (and for which it also charged MOLI). In that memorandum, LKMA confirmed that "no significant traffic impact will occur due to the proposed redevelopment of the mosque property."

94.     LMKA reiterated that finding in yet another memorandum, dated August 22, 2023 (for which it also charged MOLI): "all transportation related issues have been addressed to the extent possible given the proposed site configuration. The materials submitted to date provided a thorough analysis of transportation resources which encompassed the potential short-term, long-term and cumulative impacts of the proposed action, as well as any potential direct or indirect/secondary impacts. Based on our review of these materials, it is LKMA's professional opinion that no significant adverse environmental impacts pertaining to transportation resources as a result of the proposed action are likely."[30]

---

[30] A copy of LKMA's August 22, 2023 memorandum is attached as Exhibit E to this Complaint.

95. In light of the analyses conducted by both its own and MOLI's consultants—which DER "worked closely on" and "meticulously reviewed," as DER put it in its August 25, 2023 report—DER had no choice but to conclude that the proposed mosque "will not cause significant adverse environmental impacts as it pertains to transportation resources in the Town of Oyster Bay." DER also noted that "[t]he highest level of activity" for the mosque—which occurs for two hours a week on Friday afternoons from noon to 2:00pm—did "not coincide with the evening and Saturday/Sunday time periods when area residents are most likely to be home," and that the proposed action would not result in a significant adverse impact to community character, ecological resources, or community services, such as schools and first responders.

### ii. MOLI Obtains Approval from DPW

96. DPW likewise identified no traffic-related concerns with MOLI's application. Because MOLI's property is located on the corner of two Nassau County roads, Central Avenue and Stewart Avenue, DPW has jurisdiction over traffic-related issues concerning the site plan, such as the ability of motor vehicles to safely enter and exit the property. On September 28, 2022, DPW approved MOLI's proposed site plan; it then re-approved a slightly modified plan on March 4, 2024, advising MOLI to "submit a copy of the … approved plan set to the Town of Oyster Bay to secure a building permit."

### iii. MOLI Clears Other Municipal Processes

97. In addition to receiving sign-offs from DER and DPW, MOLI has received several other approvals from municipal entities involved with the approval process, including (1) the Town of Oyster Bay Code Enforcement Bureau; (2) the Highway Division of the Town of Oyster Bay Department of Public Works; and (3) the Engineering Division of the Town of Oyster Bay Department of Public Works.

*     *     *

98.     At the conclusion of the yearslong process, MOLI's site plan had been refined to address any plausible, good faith objection to it.  In fact, MOLI so thoroughly cleared the hurdles DER and others made it jump over that even many opponents of MOLI's site plan would later agree that the proposed mosque will be a "beautiful" building.  MOLI thus entered 2024—the seventh year of its effort to expand its mosque—with all major outstanding issues related to the application resolved, save one: parking.

## F.     Defendants Adopt a Discriminatory Parking Ordinance Targeted at MOLI's Application

99.     In mid-2022, as the above agencies reviewed and re-reviewed MOLI's site plan, the Town dramatically revised its parking ordinance to make it impossible for MOLI's proposed project to comply.

### i.     The Town Concludes that MOLI Satisfies the Parking Requirement

100.    The Town of Oyster Bay requires all new construction projects to include a certain, minimum number of parking spots, as provided in the town's "Schedule of Off-Street Parking and Loading Requirements."  Under the Schedule, the minimum parking requirement for a proposed construction depends on the "principal use" of the structure under construction. From the time MOLI first submitted its proposed plans through mid-2022, the Schedule in effect required that "[p]laces of worship" provide "1 [parking stall] per 3 seats or, if no seats, 1 per 100 sq. ft. of floor space used for public assembly."[31]

101.    This ordinance also imposed an analogous "1 [parking stall] per 3 seats" requirement on theaters.  Oyster Bay's comparable treatment of theaters and places of worship

---

[31] A copy of the Town's former parking schedule is attached as Exhibit F to this Complaint.

for calculating parking minimums made sense—both uses involve groups of people arriving and departing en masse at predetermined intervals throughout the day and week.

102.     After MOLI first submitted its proposed plans, the Town's Department of Planning and Development Commissioner Elizabeth Maccarone wrote to MOLI's architect on March 20, 2019, to inform him that, under the existing ordinance, MOLI needed to provide 97 parking spaces for its proposed site.  Because MOLI's proposed plan only provided for 88 spaces, MOLI would need to seek a small variance from the Town's Zoning Board of Appeals (as MOLI's property cannot accommodate 97 parking spots).

103.     Commissioner Maccarone's calculations, however, were wrong.  MOLI, in fact, only needed to provide 86 parking spaces, which MOLI was ready and able to provide.  The Town eventually acknowledged this error in June 2021, when Town employee Jeff Vitale informed MOLI that, far from 97 parking spots, "[t]he math for the parking calculations should be 85.78 [parking spots]," and then proposed: "[c]an we just make this easy and state Required 86 and Proposed 86?"

104.     The Town's consultants at LKMA confirmed Vitale's calculations.  In an April 18, 2022 memorandum to the Town, LKMA determined that the "Town of Oyster Bay code requires 86 parking spaces for the proposed [site] and 86 spaces are proposed," and thus "no parking variance is required."  In other words, under then existing law, MOLI's application provided enough parking.

**ii.     The Town Arbitrarily and Discriminatorily Amends Its Parking Ordinance**

105.     After the Town confirmed that MOLI needed to provide only 86 parking spaces, Commissioner Maccarone began lobbying to change the Town's law to require houses of worship such as MOLI to provide additional parking—parking she and her Department of Planning and Development colleagues knew MOLI did not have room to provide.

32

106. In approximately April 2022—after the Town had concluded that MOLI had enough parking for its proposed mosque under existing law—the Department of Planning and Development, yet another entity reviewing MOLI's site plan, asked Town Attorney Thomas Sabellico to draft a new law, Local Law No. 6, that would specifically require more parking for new houses of worship.

107. Specifically, Local Law No. 6 would switch the parking space formula for places of worship from one primarily based on *seats*—where every place of worship needed to provide one parking spot for every three seats—to one based on *occupancy*—where every place of worship needed one parking spot "per 3 persons occupancy."

108. This was an unusual proposal. A building's occupancy is generally calculated based on the criteria set forth in the New York State Building Code and relates to the maximum number of people who can physically fit in a building for safety-related purposes. A building's maximum occupancy is therefore used to calculate the required number of exits, aisles/ways to reach exits, and fire alarms. A building's maximum occupancy, however, has little to do with parking minimums, which involve a different set of concerns, namely how many vehicles are likely to be at a location at any given time. For that reason, occupancy-based parking standards are exceptional.

109. The Department of Planning and Development's proposal was also unusual for another reason: nationwide, there is a strong trend toward requiring *less* parking. As the *New York Times* recently reported: "Two billion parking spots dot the country, by some estimates. That's roughly seven spaces for every car, adding up to an area about the size of West Virginia.

For some people, that's way too many."[32]  In fact, in the last decade, "[h]undreds of cities and municipalities have rolled back or completely thrown out [parking] requirements."[33]  The Department of Planning and Development was thus bucking the trend when it proposed amending its parking schedule to require even more parking than was already required.

110.     Switching from a seat-based to an occupancy-based standard also has significant ramifications for houses of worship in general and MOLI's proposal in particular.  Because the maximum occupancy of a building is virtually always greater than the number of seats it contains, switching "seats" to "occupants" will require more parking spaces.  For instance, a church might have a worship space containing pews, walkways between those pews, a main aisle approaching an altar, and the altar itself.  In calculating required parking minimums, a seat-based approach includes solely the number of seats provided for attendees while an occupancy-based approach would include the maximum number of authorized occupants for all spaces in the entire building.

111.     In addition to imposing more onerous parking requirements on houses of worship, Local Law No. 6 would treat them differently from comparable secular uses.  As discussed above, the Town's old parking ordinance imposed analogous requirements on places of worship and theaters, requiring that both provide at least one parking spot per every three seats.  This made sense given their similar patterns of use.  Local Law No. 6, however, would treat theaters more favorably than places of worship—the former would still need to provide only one parking spot per three *seats* while the latter must provide one spot per every three *occupants*, a more parking-intensive standard.

---

[32] Martha C. White, *What Happens When There Are Fewer Spaces to Park?*, New York Times, Jan. 12, 2025, https://tinyurl.com/v4jnse7n.

[33] *Id.*

112.     And under Local Law No. 6, the only other use with an analogous, occupancy-based standard is "[b]ars/discotheques/dance hall/night club/cabarets," which also must provide one parking spot per three persons occupancy.  Bars, discotheques, dance halls, night clubs, and cabarets are, to put it mildly, quite different from houses of worship.  They are designed to be far more crowded than prayer rooms, and so should require many more parking spaces than places of worship.  Yet Local Law No. 6 treats the two consistently.

113.     In the end, Local Law No. 6, without any rhyme or reason, required more parking from houses of worship, bucked the general trends of avoiding occupancy-based standards and of lowering or eliminating parking minimums, and required treating places of worship less favorably than comparable secular uses and comparably to dissimilar secular uses.

114.     Importantly, the Town provided no legitimate basis for it.  When Department of Planning and Development Commissioner Maccarone visited the Town's Board on May 10, 2022 to lobby for Local Law No. 6's passage, she explained the amendment as follows:

> Places of Worship—again, the Code requires one spot for every three occupants.  A lot of times when applications come in, they're coming in with one per three seats, but seats and occupants are two different things because you have standing areas that people worship when they're standing as opposed to sitting.[34]

115.     This did not make sense for several reasons.  Start with Commissioner Maccarone's statement that "the Code requires one spot for every three occupants."  This was not true.  At the time, the Code required one spot for every three seats, not occupants.  Her complaint that applicants were "coming in with one [proposed parking spot] per three seats," consistent with the then-operative ordinance, was therefore odd.

---

[34] Excerpts of the May 10, 2022 hearing are attached as Exhibit G to this Complaint.

116.     Nor did Commissioner Maccarone identify any purported problem in need of solving.  To the extent that Commissioner Maccarone believed that the old ordinance could not be applied to applicants whose houses of worship lack the kind of fixed pew-seating common in churches, the old ordinance already provided that parking could be based on seats *or* "if no seats, 1 [parking spot] per 100 sq. ft. of floor space used for public assembly."

117.     Commissioner Maccarone thus failed to provide any rational basis for her proposed legislative amendment.  Indeed, she did not (and could not) point to any evidence even suggesting that there was a need for greater parking at new houses of worship, or that houses of worship in the Town frequently had more attendees than available seats.  Local Law No. 6 was, in other words, a solution in search of a problem.

118.     To summarize: Based on the suspicious timing of its proposal (while the Department of Planning and Development was reviewing MOLI's application and after it had concluded MOLI's application provided enough parking under existing law), the proposal's unusual nature, its strange results (treating places of worship like bars and discos and unlike theaters), and its seeming lack of any legitimate justification, it is apparent that the Department of Planning and Development's true motivation for proposing Local Law No. 6 was simply to require more parking from a single applicant: MOLI.

119.     While Local Law No. 6 does not have any exemptions on its face, the Town Attorney also testified on May 10, 2022 that he understood that "those buildings that have already been built, or those properties that are already in the process" would be grandfathered in and "not affected by this law."  But that would not apply to MOLI's proposed place of worship and to other newcomers like it.

120.     The strong inference of discrimination arising from these suspicious circumstances was, in fact, voiced at the May 10, 2022 hearing by a developer and vendor in attendance who had decades of experience with the government of Oyster Bay.  He questioned the purpose of Local Law No. 6 and suggested it was discriminatory: "*I don't think the churches are full these days, and we're having a parking conversation about churches.  I don't believe it's for the churches that I attend.  They seem to be well parked.*"  A Town Board member, Louis Imbroto, responded that the purpose of the amendment to the minimum parking requirements for houses of worship was not exclusively parking-related, stating: "Parking is one consideration. It's one consideration."  The developer responded: "*I'll speak to the elephant in the room, are we using parking to limit ... certain people's usage of property?  If that's what we're doing, call --*". Mr. Imbroto cut-off the developer, quickly changing the subject.  But the developer's observation remained unrefuted; indeed, no member of the public spoke in favor of Local Law No. 6 or offered any legitimate, non-discriminatory reason for it.

121.     On June 14, 2022, the Town Board officially passed Local Law No. 6 of 2022, officially requiring one parking space "per 3 persons occupancy" rather than one parking space "per 3 seats or, if no seats, 1 per 100 sq. ft. of floor space used for public assembly."[35]

### iii.     The Town Requires MOLI to Provide an Inordinate Number of Parking Spots

122.     Following the adoption of Local Law No. 6, the Town has recalculated the number of parking spots MOLI must provide for its proposed mosque several times.  Under all recalculations, MOLI must now provide a number of parking spots that is both impossible to achieve and far greater than the 86 spots required under the prior law.

---

[35] A copy of Local Law Number 6 is attached as Exhibit H to this Complaint.

123. On March 7, 2023, the Town's consultants at LKMA calculated that, under the amended code, MOLI now needed to provide *135* parking spots—a 57% increase directly resulting from the Town's decision to amend its parking laws to require more parking from places of worship.

124. The Town then recalculated its requirement yet again to demand that MOLI provide it with even more spots. On June 28, 2023, Department of Planning and Development's Gina LoPresti informed MOLI that the Town's Public Assembly Inspector, Nick Condoleo, now estimated that the proposed mosque's maximum occupancy was 506 people, meaning MOLI would need to provide a completely untenable *169* parking spots for its new site.

125. This 506-person occupancy calculation—which was approximately 100 people higher than the Town's previous maximum occupancy estimate—was based on Inspector Condoleo's application of a 1-person-per-every-7-square-feet formula to calculate the maximum occupancy of MOLI's prayer room. This was an arbitrary, irrational, and discriminatory choice as, under Town law, that 1-to-7 formula applies only to calculating the occupancy of *dance floors*—not houses of worship. *See* Town of Oyster Bay Town Code § 183-12(b) (establishing "1 per 7 square feet" as the "number of persons permitted" to occupy "dance floors" in occupancies other than "restaurants, cabarets [and] catering halls").

126. Inspector Condoleo then reversed course again. On May 29, 2024, LoPresti informed MOLI that Condoleo had recalculated the maximum occupancy of the proposed mosque as 464 rather than 506, which would require approximately 155 parking spaces—a roughly 80% increase from the 86 spots initially required as a result of Local Law No. 6.

127. Thus, in the years after the Town initially concluded that MOLI needed 86 parking spaces, the Town changed its law to require 135, then 169, then 155 parking spaces from

MOLI. But while the numbers see-sawed, one thing remained clear: Oyster Bay's new occupancy-based ordinance requires far more parking of MOLI than the old seat-based ordinance.

### G. An Islamophobic Pressure Campaign Launches to Derail MOLI's Application

128. As discussed above, by the end of 2023, MOLI had obtained many of the regulatory approvals needed to construct its new building, including required approvals from DER, DPW, and other reviewing agencies. Because of Local Law No. 6, however, the only significant outstanding issue for MOLI's application was parking. And under the new law, MOLI simply did not have enough space to provide the parking required by the Town. To move forward with its application, MOLI therefore needed to obtain conditional approval of its site plan from PAB. MOLI rightfully expected that, because it had complied with all other applicable site plan approval requirements and criteria as set forth in the Town Code, PAB would approve the site plan conditioned upon MOLI obtaining a parking variance from the Town Zoning Board of Appeals, which MOLI would then pursue. Indeed, as DER had confirmed in approving MOLI's submission, such a parking variance was the only variance that MOLI would need to obtain.

129. PAB scheduled a hearing for the evening of January 11, 2024, to determine whether to approve MOLI's site plan. NCPC, which would issue a recommendation to PAB regarding MOLI's application, also planned a meeting for earlier that same day to discuss MOLI's site plan.

130. As the January 11, 2024 hearing date approached, word spread around the Town that PAB was considering whether to approve a renovated mosque. Several community members, motivated by discriminatory animus, embarked on a coordinated campaign to pressure

Town and county officials—including a powerful Nassau County Legislator, Rose Marie Walker—to oppose the mosque.

131.    In the days leading up to the hearing, nearby residents inundated Town officials and Ms. Walker with letters and emails urging them to oppose the MOLI site plan, often on expressly anti-Muslim and anti-religious grounds:

- Stefanie Byrne, a Bethpage resident, wrote to Ms. Walker to oppose the mosque, claiming that it would be an "eye sore" that would not contribute to Bethpage's "appeal and aesthetics."

- Diane Storey of Bethpage wrote to Ms. Walker: "[A] Mosque, why? Are we going to give in and give up our neighborhood?"

- Another Bethpage resident, Sophia Hapsis, emailed Ms. Walker that she knew she would be branded "bigoted" for opposing "a religious establishment" but that it was the responsibility of her elected officials to "stop the building [of] this massive structure, which in no way fits in with our neighborhood and our suburban way of life."

- James Giovanniello, a Bethpage resident, emailed Town Supervisor Joseph Saladino, Ms. Walker, and other local officials that the new mosque threatened Bethpage. He wrote that the new mosque would bring more traffic to Bethpage because "the Muslim religion requires its followers to pray FIVE TIMES A DAY." He argued: "Allowing the building of such an enormous house of worship will change the landscape of Bethpage. The changes that this will bring to our community will never go away if the application is approved and we will never be able to reverse course after that."

- Lena Ritchie, a Bethpage resident, wrote to Ms. Walker that she was "confident" "that many of [MOLI's] worshippers are not Bethpage or surrounding area residents" and would not "patronize our local businesses" or provide any "value add" to Bethpage. She specifically contrasted this with the congregants of local Christian churches, who she claimed would "get bagels ... after mass." She claimed that the mosque should be opposed because of the alleged refusal of MOLI's congregants' children to assimilate: "their children will likely NOTparticipate [sic] in our local [Police Athletic League] or [Catholic Youth Organization] teams, our local dance studios or visit our public library, integrating with the Bethpage community."

- Another Bethpage resident, Michelle Melisi, urged Ms. Walker to "stand with the community that has lived here for many years. These are the individuals that have roots here, that have raised families here, not the newcomers that are looking to change our quality of life to suite [sic] the needs of only a certain

population." She also expressed anger "that these religious institutions will not be paying taxes" and that "[w]e cannot handle anymore" of "these new buildings [that] are [tax] exempt."

- Another Bethpage resident, Chris Romano, emailed Ms. Walker to oppose the mosque because Muslims (like many congregations around the world) have designated prayer rooms for men and women, a practice the resident found "totally disturbing."

- And Peter Micciche—who appears to be the same Bethpage resident who had sent the 2010 email urging residents to complain to officials (including Ms. Walker) about MOLI and resisting the construction of another mosque— wrote to Ms. Walker too, insisting that the Town must "stop the building of this massive structure which in no way fits with our neighborhood and our suburban way of life."

132. Similar sentiments appeared on social media. For instance:

- Frank DiRico posted on Nextdoor that he opposed the mosque because he felt that religious uses do not "contribute taxes to the area" and so put "the burden on the residents" to pay higher taxes.

- Another poster on Bethpage Long Island's Official Page on Facebook cut to the chase, posting anonymously:



133.     And when Frame Auto Collision, a local business, posted on Facebook that a

"Mega Mosque [was] being proposed" that night at PAB's meeting, commenters heaped on

prejudiced objections:

- Mike Donaldson stated that a mosque was a threat to Bethpage's Jewish community ("we have Jewish people living here it's not right").

- Jay Popiel stated that "the takeover has started."

- Jacqueline Walker Ray commented: "This 'religion' has a hoe-down every 3 days it seems."  Referencing a nearby hamlet with a sizable Muslim population, she also commented: "protest protest protest! … you'll turn into Hicksville.  How many mega mosques do these egomaniacs need?"

- Wayne Rhatigan, seemingly referring to the Muslim call to prayer, commented: "wait till the sound of the wailing horn goes off.  And there is nothing you can do about it!!!"

- Mike Spinelli asked: "Does anybody remember that there were two towers in Manhattan or did people forget and now we're asked to put a place like this in downtown Bethpage really?!"

- Bobby Bergstrom mocked MOLI's primarily South Asian parishioners: "they've turned Hicksville downtown into Calcutta[.]  [I]t's coming down the road towards Bethpage give it 4 years!"

134.     Meanwhile, area residents who supported the mosque were clear-eyed about the

nature of the opposition MOLI faced.  As one supporter commented on Facebook: "if you read

between the lines, it's not about parking or structures."  Another commenter responded: "I

absolutely did read between the lines.  Very disappointed."

135.     On January 11, 2024, the day of the PAB and NCPC meetings, Ms. Walker sent a

letter to NCPC urging it to reject MOLI's proposed site plan.  She claimed that her "office has

received many phone calls and emails over the years regarding traffic and parking in the area"

around the mosque, and she suggested that expanding the mosque could make that situation

worse.  Tellingly, Ms. Walker failed to copy MOLI on the letter.  And her claims were baseless.

In fact, when MOLI later sent Ms. Walker and the Nassau County Legislature a New York State Freedom of Information law ("FOIL") request for any evidence of such phone calls and emails "over the years," they failed to turn over any evidence that predated January 2024.

136.     To ensure that MOLI's proposal would not proceed, Ms. Walker also took the unusual step of attending NCPC's January 11, 2024 "pre-meeting," a working session that NCPC holds before its regular meeting. Ms. Walker is not a member of NCPC and does not ordinarily attend its pre-meetings or meetings. Indeed, while NCPC's working sessions are public, they are rarely attended by anyone other than NCPC's members themselves and the applicant. NCPC nonetheless permitted Ms. Walker to join the working session by phone—she claimed to be traveling at the time—and she vociferously opposed the construction of the mosque, urging NCPC to reject MOLI's site plan. NCPC then issued a resolution, NCPC Resolution No. 10557-24, that purported to deem MOLI's application incomplete. MOLI was not informed of this resolution until five months later on June 11, 2024.

137.     In the face of Legislator Walker's unexpected, stiff resistance, MOLI decided to further delay its plans by canceling its scheduled hearing before PAB, which was set for later that night, in order to consider concessions it could offer to address community objections to its house of worship.

138.     Legislator Walker promptly informed her constituents, posting on Facebook that PAB hearing had been "postponed at the request of [MOLI]" and that a "new date w[ould] be advertised once the applicant finalized their resubmission."

139.     Opponents of the mosque then shared this news widely on social media, along with instructions that opponents of the mosque should "[e]mail our planning commission with a cc to Rose Walker with why you oppose [the Application]." The opponents also told objectors

to appear at the PAB meeting.  Mirroring the well-worn tactics often deployed to resist the construction of minority houses of worship nationwide, the opponents encouraged objectors to cloak their prejudice in land-use jargon, such as complaints about "clogging roadways" or "crossing mid block."  Sometimes they veered into the outright absurd, asking objectors to raise alarm over "the dangers of people parking on side streets."

## H.    The Opposition Causes MOLI to Make Modifications to Its Site Plan

140.    Taking stock of the political reality facing it—in which an influential, highly motivated group of community residents and elected officials was pressuring local officials to oppose a Muslim house of worship in a town with a history of religious discrimination—MOLI went back to the drawing board to consider how it could offer more parking at its new mosque while preserving the space its congregants needed to practice their faith.

141.    To this end, in February and March of 2024, MOLI's architect sent modified site plans to DPW and the Town's Department of Planning and Development that netted MOLI additional parking stalls above what it had previously been able to provide.

142.    DPW approved MOLI's amended application on March 4, 2024 and the Department of Planning and Development confirmed a few days later that it would try to schedule MOLI for PAB hearing scheduled for May 9, 2024.  PAB then dragged its feet, ultimately scheduling the hearing for July 18, 2024.

143.    In advance of that hearing, on July 16, 2024, Gina LeBright of the Town's Planning Division circulated an inter-departmental memo regarding MOLI's application to Defendant Scott Byrne, Deputy Commissioner of the Town's Department of Planning & Development and a member of PAB.  LeBright wrote that, after reviewing all the documents that MOLI had submitted for review, "it is the determination of this Division that [MOLI] has

***satisfactorily addressed all concerns relative to the Town of Oyster Bay's Zoning Ordinances***,
as they pertained to the site plan alterations proposed in this application."[36]  (Emphasis added.)

144.    Meanwhile, MOLI continued its decades-long effort to be a good neighbor by
hosting a community townhall at a local library to educate the community on its application.
Roughly 100 people attended.

## I.    Succumbing to Pressure from Objectors, NCPC Recommends Denying MOLI's Application to "Send a Message"

145.    On July 18, 2024, approximately six years after it first started seeking approval to
expand its mosque, MOLI returned to NCPC to attend its pre-meeting work session before
NCPC was finally to issue its recommendation to PAB.  But the discussion did not take place in
the back conference room where working sessions are normally held.  Rather, it took place in
NCPC's larger hearing room where Ms. Walker was given an opportunity to be heard—having
clearly been notified in advance that the application would be discussed that morning.

146.    Reviewing the changes to the application since January, NCPC acknowledged
that revisions had been made to the site plan but deemed them "nothing radical."

147.    NCPC then discussed traffic safety at the mosque, an issue that had already been
thoroughly analyzed by the mosque's traffic consultants at R&M, by the Town's own consultants
at LKMA, and by DER—all of which had concluded that the proposed mosque would not
substantially impact traffic in the area.  DPW—the entity with jurisdiction over the roads outside
the proposed mosque—had also had multiple opportunities to weigh in on traffic-related issues.
It, too, had received extensive reports on traffic and safety issues related to the application and
had repeatedly approved the application, including, most recently, in March 2024.

---

[36] A copy of LeBright's memo is attached as Exhibit I to this Complaint.

148.    NCPC disregarded these facts.

149.    Ms. Walker—making yet another appearance, this time in person—opened the meeting with prejudice masquerading as paternalism. While begrudgingly admitting that MOLI's congregants had "been good neighbors," she argued against the mosque's expansion, purportedly for the Muslims' own well-being. With remarkable seriousness, she claimed that attending the mosque as it currently exists was "very dangerous even [for] those attending the mosque," because, in her imagination, worshippers apparently "just stop in the middle of either one of [the adjacent] roads and just let people out."

150.    Some of the NCPC commissioners also directly attacked the mosque's congregants. Acting Chair Jeffrey Greenfield said he was "infuriated" by how "many [congregants] disrespect the neighbors" by allegedly parking in front of fire hydrants. Commissioner Reid Sakowich explained that he, too, opposed MOLI's application, based on his experiences with an unrelated mosque and unrelated Muslims fifteen miles away in New Hyde Park: "I've lived this experience in New Hyde Park…. I've seen Hillside Avenue in New Hyde Park shut down on a many, many, many times by people just being late for services and just leaving the cars out on the roads."

151.    In response to this opposition, MOLI offered NCPC an enormous concession: It would voluntarily cap its new mosque's occupancy at just 264 people—roughly 56% of its actual maximum occupancy—to avoid the supposed "issues" caused by congregants parking (legally) on public streets to attend religious services.[37]

---

[37] A 264-person occupancy cap would have also satisfied the strictures of Local Law No. 6 because 264 divided by 3 is 88, which is the number of parking spots contained in MOLI's application. A transcript of NCPC's July 18, 2024 work session is attached as Exhibit J to this Complaint.

152. This did not satisfy NCPC. Later that morning, during the NCPC's regular meeting, Acting Chair Greenfield mused "[w]hy not deny," which would require MOLI to secure a supermajority vote from PAB. Commissioner Sakowich agreed, reiterating his previous anti-Muslim sentiments: "I live this in New Hyde Park. And it's just horrendous."

153. One Commissioner, Third Vice-Chair Neal Lewis, dissented. Lewis explained that he grew up in Bethpage and that his mother lived in a senior center near the mosque. He recalled that, when attending church as a child, his family "often park[ed] in properties that [were] not in the parking lot," but observed that "usually it's only … once or twice, you know, a week…. And … as long as it's legal parking, hopefully it's okay."

154. Acting Chair Greenfield rejoined: "In my parish, it's only three times a year." Apparently unwilling to make it easier for another faith group to practice its religion, he recommended denying MOLI's application to, in his words, "send a message" to PAB.

155. The commissioners then voted five-to-one to recommend to PAB that the application be denied. This recommendation packed a punch. By law, a negative recommendation by NCPC meant that PAB could only approve MOLI's site plan by a supermajority vote.[38]

**J. Objectors Pressure PAB, Causing It to Delay a Vote on the Application**

156. Later that evening, Plaintiffs and several hundred other individuals, mostly MOLI congregants, attended the long-awaited PAB hearing on the application.

157. At the start of the hearing, MOLI's attorney and consultants summarized the years' worth of agency review that resulted in MOLI receiving approvals from DER, DPW, and

---

[38] A transcript of NCPC's July 18, 2024 regular meeting is attached as Exhibit K to this Complaint.

other agencies. They also recommitted to the same concession they had offered NCPC that morning: voluntarily capping the mosque's occupancy at 264 people to ensure compliance with Local Law No. 6 without need for a variance.

158. This concession—which would minimize traffic flowing into and out of the mosque—got MOLI no further before PAB than before NCPC. Upon hearing it, Defendant Stanco roared: "[s]o you cut your number down. Why don't you cut your building down?" The portion of the crowd that opposed the mosque erupted in applause.

159. MOLI's attorney explained that the entire point of the application was to provide MOLI with desperately needed space for its congregants to practice their faith. Plaintiff Makda testified about the limitations of Plaintiffs' current facility and how MOLI's plans would address them. He explained that, while the *occupancy* of the proposed mosque might be 464 people, that calculation included all available space, including "classrooms, the prayer area, the bathrooms, the library the offices, everything," not all of which would be used simultaneously. He noted that MOLI could not simply "cut [its] building down," as Defendant Stanco proposed, without losing the very features the expansion was intended to provide, including proper classrooms, a library, and sufficient wudu stalls and bathrooms.

160. MOLI's traffic consultant, Wayne Muller, P.E. of MOLI's engineering firm R&M, then testified at length regarding his extensive study of the traffic issues—or lack thereof—posed by the application. Muller reminded PAB that the purpose of the application was to better serve MOLI's existing congregation, not to expand its membership, that his firm had concluded that the proposed mosque would not result in any significant increase in traffic volume, and that the Town's own parking consultants at LKMA had concurred in that analysis.

161.     Muller further noted that the mosque was located within a few hundred feet of several other churches, one of which provided *no* parking spots and two of which provided less parking (per square foot) than the proposed mosque.  Muller made a very basic point regarding these churches: it is normal and legal to utilize lawful public parking spots to attend a house of worship.  Thus, the fact that some congregants of MOLI may have to park on the streets around the mosque or in a nearby community parking lot rather than in a mosque-specific lot was no reason to oppose the application.

162.     Following these remarks, PAB heard public testimony on the issue.

163.     Proponents of the Application spoke about the importance of an expanded mosque, with Plaintiff Qureshi taking the lead in explaining why his congregation wanted to expand from a roughly 5,000 square foot facility to a 16,000 square foot building:

> Why are we building this "monstrosity," that a lot of people are labeling it online, for 16,000 square feet?  Small example.  We have the evening school from 5:00 to 7:00.  Do you know where we teach our kids?  We have makeshift classrooms in the assembly area.  Our kids, they sit on the floor.  They don't have tables.  They don't have chairs.  The walls are curtains so that next class, next to them, if somebody's screaming, we can't even teach next door.  So, what we are asking, what we're trying to build here is, hey, give us classrooms for our kids.
>
> […]
>
> We have three bathrooms in the two buildings right now.  Just the evening school, which has over 90 to 100 kids, we're below – everyone's almost age 12 and below there.  Now imagine for two hours, those kids are there and using only three bathrooms, the type of mess they're making there.  What we're asking is we want to build some more bathrooms.
>
> […]
>
> The third thing what folks need to understand is in the Muslim faith, we have to perform a ritual before we pray.  We have to do ablution, wash our hands, wash our arms, face, feet.  Currently, we

have between the two buildings almost 12 to 14[39] stalls for the number of congregants that we get. What we want to do is have some more stalls for the people.

So we're not asking, hey, you know what, let's have another assembly area. We're asking for classrooms. We're asking for bathrooms. We're asking for these stalls where people can come and then do their ritual. I think what folks need to understand is the 16,000 includes that space.

[…]

Again, the point here that I'm trying to make is we're not increasing our congregants. These spaces, they're going to be used for bathrooms, stairways, stalls, [a library]. We want to have counseling for our congregants. You know where counseling happens now? Either in the assembly area in the corner where everybody is looking at you, hey, what is, you know, Moeen talking to the imam about? Maybe he has a problem at home or maybe he needs some money or something. Or in the corner of the parking lot where everybody was coming out and looking at them.

164.    Meanwhile, opponents of the application continued to press baseless attacks against the mosque. These opponents included, once again, Ms. Walker who, after an intimate introduction from Defendant Stanco ("Hiya, Rose"), repeated her NCPC talking point: that, despite multiple consultants and multiple agencies concluding the opposite, the intersection in question was already too crowded with cars for the mosque's congregants to be able to park in a safe manner to attend services.

165.    Other opponents called out the congregation simply for being Muslim and South Asian. One opponent testified, "I know your culture, whether it's Indian or Pakistani," and recommended that MOLI simply "look around for bigger buildings and make us all happy." And others continued to engage in rank fear mongering. One opponent expressed concern that young

---

[39] The Mosque currently has 10 wudu stalls between its two buildings.

Muslim boys would use the second floor of the mosque to leer down on his teenage daughter and her friends while they swam in his pool.

166.    At the conclusion of the public testimony, PAB voted unanimously to hold the public record open for another thirty days for any further written input and to "reconvene on September 12, 2024 to render a decision."

167.    At no point during the hearing or after did PAB suggest measures to accommodate MOLI's proposed religious use while mitigating any alleged adverse effects to the surrounding community.[40]

## K.    Under Pressure from Islamophobic Demands, PAB Denies MOLI's Application

168.    Following the July 18 hearing, PAB received a new wave of anti-Muslim, anti-religious letters urging it to deny MOLI's Application.  For example:

- James Giovanniello wrote to argue that a larger mosque would result in a less "suburban feel and look to Bethpage" and to question how many of the mosque's congregants "actually live in the hamlet of Bethpage."

- Peter Micciche—again, the apparent author of the 2010 mass email urging Muslims in Bethpage to "go else where" because Bethpage "is not a Muslim neighborhood"—similarly wrote that expanding the mosque was "not fair to the people who have lived in this town for many years, have paid taxes for many years and who have voted for you in our elections for many years."[41]

---

[40] A transcript of PAB's July 18, 2024 meeting is attached as Exhibit L to this Complaint.

[41] This email, which is attached as Exhibit M to this Complaint, appears to offer a case study in how Islamophobic sentiment can disguise itself in terms that are not expressly anti-Muslim. Micciche's September 11, 2024 email to Ms. Walker and others opposing MOLI paints Muslims as newcomers who are not part of the Bethpage body politic—an Islamophobic trope to be sure—but stops short of saying anything expressly anti-Muslim.  However, Micciche *also* appears to be the author of the July 28, 2010 email that *also* opposed MOLI and *also* directed this opposition to Ms. Walker.  *Compare* Ex. A (July 28, 2010 email from a "Peter" with the email pmicc@optonline.net) *with* Ex. M (September 11, 2024 email from Peter Micciche).  Back in 2010, Micciche openly asserted: "[t]his is not a Muslim neighborhood."  *See* Ex. A.  His end goal today appears no different—he does not want Muslims in Bethpage—but he appears to have wised up and made his anti-Muslim sentiments less overt.  This evolution—or lack thereof—illustrates why facially neutral complaints about issues like "traffic" and "suburban" quality of

---

- Kristin Waldron wrote that "more people … attend[ing] the tremendous mosque" would change "the culture of Bethpage … forever," as "their values in their religion promote men to be more valued than women and the women are thought of as less then."

- Craig and Danielle Travers echoed this concern of Bethpage being overrun by Muslims: writing that the "monstrous structure" proposed by MOLI would "change the entire demographic and overall landscape of the community."

- Lisa Mastandunno wrote that the application should be denied because "[i]t is doubtful that the building would be used by outside groups such as the scouts and other clubs … due to the constraints of the Muslim faith, i.e. the removal of shoes and the washing of feet."  She further stated that "the main problem" with the mosque is that "[t]hose practicing their Muslim faith at this mosque attend prayer services many times a day in keeping with the requirements of their faith," which in her view would necessarily lead to people "rushing to get to the mosque at the required prayer times, then hurrying out to get back to their other commitments," causing a "safety concern."

169.    After receiving these letters, PAB stalled.  Though it had voted unanimously in July to issue a decision on September 12, 2024, it waited another two additional months to reconvene, violating New York law that required it to render a decision within sixty-two days of the July 18, 2024 public hearing.  *See* N.Y. Town Law § 274-a (8).  When it did eventually reconvene, on November 14, 2024, PAB voted unanimously and without discussion to deny the application.[42]

170.    On information and belief, this was the first application PAB had denied since at least 2018.

171.    Having killed MOLI's application, PAB then delayed its funeral.  PAB waited until December 26, 2024 to issue a written decision, refusing to release it until a "special counsel" and a retired Justice of the Nassau County Supreme Court had reviewed it.  PAB's

_____

life cannot always be taken at face value when a community mobilizes to oppose construction of a house of worship.

[42] Excerpts of PAB's November 14, 2024 meeting are attached as Exhibit N to this Complaint.

delay only further prolonged MOLI's yearslong effort to construct its new mosque and again violated New York law, which required issuance of a written decision within five business days of PAB's November 14, 2024 vote. *See* N.Y. Town Law § 274-a (8).

172.    In its written decision, PAB asserted that "at the public meetings held on January 11, 2024 and November 14, 2024, the [PAB] duly reviewed all the pertinent and relevant materials, exhibits, submissions and testimony."[43]  This was false.  As discussed above, the January 11, 2024 PAB meeting never occurred, and, at the November 14, 2024 meeting, PAB did nothing other than vote unanimously without discussion.

173.    In its written decision, PAB then pointed to purported concerns regarding parking, traffic, and community character as bases for denying MOLI's application.  But those concerns were just baseless pretexts designed to whitewash the real reason for PAB's denial: anti-Muslim bias.

### i.    PAB Cites Debunked Parking and Traffic Concerns

174.    PAB asserted that the mosque does not currently have enough parking spots to accommodate all congregants at all times and that this "current shortage of parking requires worshippers to park on residential streets as well as main roads."  According to PAB, "[m]any residential neighbors testified that cars from the place of worship park haphazardly and block their driveways" and that "[m]any neighbors expressed their concerns regarding increased traffic …. and increased parking on residential streets."  PAB claimed that "[t]his situation imposes a clear threat to the health, safety and welfare of the surrounding neighbors," citing a resident who "testified that while dropping off her grandchildren at a local daycare in her [SUV] she was

---

[43] A copy of PAB's written denial is attached as Exhibit O to this Complaint.

unable to fit down the residential streets with the overflow parking from the place of worship."[44]

Per PAB, "[t]he resident noted that if her [SUV] couldn't fit down the street that an ambulance, fire truck or any large emergency vehicle certainly would not fit down the street." PAB therefore concluded that the mosque—in its current form—threatens the safety of the neighborhood, and the proposed expansion "will only intensify these unsafe conditions."

175. That conclusion was baseless. For one, it completely ignored MOLI's offer to voluntarily cap the occupancy of its new mosque at 264 individuals, roughly 56% of the mosque's actual maximum occupancy.[45]

176. PAB's conclusion was also contrary to the findings of multiple consultants, retained by both the Town and MOLI, who had spent years analyzing the potential traffic and safety impacts of the proposed mosque and had concluded that it posed *no* significant risk in that regard. Those analyses, in particular, revealed that *37.27 million* cars entered the intersection outside the mosque during a three-year period and there were *zero* accidents involving a pedestrian or cyclist and *zero* fatalities. And while 11 cars were involved in an accident causing an injury, no evidence exists suggesting those injuries were serious or linking *any* of those accidents or injuries to MOLI's congregants, rather than to the tens of millions of other people who have passed through that intersection in their motor vehicles. In fact, in light of all the evidence available to it, DER found that MOLI's proposal would "***improve traffic safety*** by retaining vehicles on-site for travel between the two parking areas, eliminating one of the four

---

[44] This testimony did not take place on July 18 and is not present in any of the community letters comprising PAB's public record. PAB therefore appears to have invented it. In any event, even if an elderly neighbor of the mosque did have difficulty navigating her large vehicle, that would hardly be a reason to deny a religious land use application.

[45] To be clear, this concession was offered to PAB in the hope of obtaining site plan approval. MOLI has a legal right to permit more than 264 individuals into its proposed mosque and reserves that right now that Defendants have denied its application.

existing driveways, and providing for more controlled access with additional signage (i.e., permitting only right turns for all ingress and egress movements to and from the site)."

177.     Additionally, multiple agencies, including the Town's DER and Nassau County's DPW, had reviewed the consultants' analyses and likewise concluded that the proposed mosque would not exacerbate parking and traffic issues in the surrounding neighborhood.  DER, in fact, found that "even with the overflow parking associated with peak activity at the [mosque] … parking will remain available along the adjacent public streets to accommodate the parking needs of the community during the limited time periods of peak activities at the mosque."  And DER noted that those peak periods are "only during the prayer periods on early Friday afternoons (typically between 12:30 p.m. and 2:30 p.m.), which does not coincide with the evening and Saturday/Sunday time periods when area residents are most likely to be at home."  DER likewise concluded that the proposed mosque would not adversely impact emergency services, or public health and safety.

178.     PAB was well aware of those conclusions; indeed, PAB not only stated in its decision that it had reviewed DER's August 25, 2023 report but also that it was adopting DER's conclusions therein.  Yet, without any justification, PAB cast aside the well-supported conclusions of DER—as well as those of DPW and multiple experts—in favor of unsupported complaints from members of the public.  That is arbitrary and capricious, and indicates that that the true reason behind PAB's decision to deny MOLI's application is not parking or traffic but rather outright bigotry or acquiescence to it.

### ii.     PAB Cites the Amorphous Concept of Community Character

179.     In addition to pretextual concerns regarding parking and traffic, PAB also offered a more amorphous justification for its denial: that the expanded mosque would negatively impact the character of the surrounding neighborhood.  According to PAB, it had received complaints

from the mosque's neighbors that the mosque was causing the neighborhood to "resemble[] a borough of New York City and not a suburban town in Nassau County."[46]

180. As an initial matter, PAB took this quote out of context. PAB appears to be quoting a January 9, 2024 letter to Ms. Walker from Rob Kossman, a resident of Bethpage. Kossman wrote: "Parking – St. Lukes Church/Daycare. My block also sees a lot of activity due the [sic] daycare on the corner of Kearney Ave. Between the children pick ups & drop offs, AA meetings and religious activity, the parking on my street can resemble a borough of NYC, not suburban Nassau County."

181. As the full context of this quote shows, this resident attributed the purportedly urban feel of his block to its daycare facility, its AA meetings, and to its "religious activity," by which he appeared to primarily mean the operation of "St. Lukes Church," a local Christian house of worship. PAB thus excised this resident's quote from its full context—which blamed a number of specific activities but not the mosque—in order to misquote the resident as blaming the mosque for causing the area to have an urban feel.

182. Regardless, PAB's assertion that the application was not consistent with the "suburban" look and feel of Bethpage—its purported community character—is unsupported. PAB did not explain why a flourishing house of worship was inconsistent with the "suburban" character of a neighborhood that already contains several houses of worship and many less than

_____

[46] Surely any resident of Long Island can hear this dog whistle. New York City is famously diverse. Parts of Long Island are famously *resistant* to racial diversity. *See, e.g.*, Ann Choi, et al., *Long Island Divided*, Newsday, Nov. 17, 2019, https://tinyurl.com/3c72c5uf ("In one of the most concentrated investigations of discrimination by real estate agents in the half century since enactment of America's landmark fair housing law, Newsday found evidence of widespread separate and unequal treatment of minority potential homebuyers and minority communities on Long Island."). Thus, denying a group of Muslims the right to update their mosque to keep a "suburban town in Nassau County" from looking like "a borough of New York City" amounts to little more than denying the application to keep Muslims out.

idyllic businesses, such as a smoke shop, psychic, and gas station. PAB also did not acknowledge or justify departing from DER's conclusion that the application would not negatively impact community character. Nor did PAB acknowledge that the mosque is located within the Town's GB (General Business) zoning district and that places of worship are permitted uses within the GB district, itself constituting a legislative determination by the Town that the mosque is appropriate for its area. Nor did PAB acknowledge—or justify departing from—the conclusion of the Town Planning Division's July 16, 2024 memo: that the mosque "satisfactorily addressed all concerns relative to the Town of Oyster Bay's Zoning Ordinances."

183.    PAB also falsely claimed that "[a]lmost all the testimony received indicates that [the mosque] already poses a negative impact on the surrounding neighbors."

184.    At the July 18, 2024 PAB hearing, several individuals—including Plaintiffs Makada and Qureshi and others not affiliated with the mosque—testified to the positive impacts of the mosque and MOLI's need for a larger facility. Such testimony was cheered on by a crowd of hundreds of supporters who gathered at the hearing to advocate for the application. PAB did not acknowledge—or justify ignoring—this testimony and community support for the application. In fact, as set forth above, even opponents of the mosque, including one of its immediate neighbors and its most prominent critic, Ms. Walker, testified that MOLI had been a good neighbor. PAB did not acknowledge this testimony.

185.    Nor did PAB acknowledge the written letters of support it received from non-mosque affiliated community members who supported its application. For example, PAB received—but did not consider—a July 18, 2024 letter from Anne Weeks, who described herself as "a Bethpage resident for over 60 years." Ms. Weeks wrote: "I want to voice my support for building the mosque on the corner of Stewart and Central Ave." Ms. Weeks wrote that the area

around the current mosque is "run down" and that "having a Mosque with community services and events with parking is so much better than what is there now."

186.     PAB's concerns about community character, like its concerns about parking and traffic, were thus simply a pretext.  PAB's denial of MOLI's application is textbook discrimination, and, in fact, PAB could not help but admit that it was treating the mosque differently.  Specifically, PAB acknowledged that "we have many non-conforming non-residential uses that do impose a negative impact on the surrounding properties that frequently generate complaints from neighbors."  PAB, however, did not justify its decision to treat the mosque worse than these "many" other properties—presumably non-mosques—which it evidently tolerates.

187.     PAB's decision to reject the application based on the asserted community character of Bethpage and the allegedly widespread community opposition to the mosque was therefore arbitrary, capricious and otherwise unlawful.

*          *          *

188.     The law does not require the Court to check its common sense at the courthouse door.  The unmistakable reality—barely disguised in PAB's paper-thin written denial—is that PAB caved to an anti-Muslim faction in Oyster Bay by denying a meritorious application for pretextual reasons.  The Town simply does not want to see an expanded mosque built in Bethpage.

## L.     Defendants and Nassau County Have Stonewalled Plaintiffs' FOIL Requests and Retaliated Against MOLI For Exercising Its Rights

189.     To better understand the nature of the discrimination it has faced, MOLI has sent multiple requests under FOIL to Defendants, as well as various Nassau County entities and Ms. Walker concerning the application.

190.    The recipients of these FOIL requests either ignored them, declined to produce all responsive documents, or in the case of the Town, actively retaliated against MOLI for sending them.

191.    For example, on June 20, 2023, MOLI served a FOIL request on the Town seeking documents related to eight topics.  The FOIL request was designed to learn more about the Town's internal treatment of the application as, by then, it had become clear that the Town was sandbagging approval of the mosque because it was just that—a mosque.

192.    Instead of complying with its legal obligation to respond to these requests, on July 17, 2023, the Town produced just five records, two of which were decades-old and entirely irrelevant to MOLI's FOIL request.  Importantly, at the very same minute that James Suozzi, a Town employee, emailed these records to MOLI, Department of Planning and Development Commissioner Harold B. Mayer, Jr. issued a letter to MOLI alleging that MOLI did not have an operative Certificate of Occupancy.  That Commissioner Mayer sent his letter the same minute as his colleague's response to MOLI indicates an intent to intimidate MOLI into abandoning its search for information about the Town's handling of its application.

**M.    Impact on Interstate Commerce**

193.    The construction of MOLI's proposed structure will affect interstate commerce, including through payment to those constructing the mosque; purchase of materials necessary to build the mosque; use of interstate highways for the transportation of persons and materials used to construct the mosque; and other activities related to the construction of the mosque.  If built, MOLI's mosque will affect interstate commerce by or through, amongst other things, the employment of any part- or full-time employees that will use modes of transportation affecting interstate commerce, and the purchase of goods and services related to the mosque's ongoing operations and maintenance in a manner that will affect interstate commerce.

**N.    Fact Discovery Affirms Plaintiffs' Claims and Exposes Additional Irregularities and Discriminatory Conduct by the Town**

194.    The parties are nearly finished with fact discovery, which is set to conclude on August 1, 2025.  Below, Plaintiffs summarize the key facts that have emerged thus far that underscore the validity of the relief they are seeking and show further misconduct by the Town and its officials.

195.    **First, discovery has affirmed that Plaintiffs' Application provided enough parking prior to the passage of Local Law No. 6.**  As discussed above, the Town concluded by June of 2021 that MOLI had proposed enough parking spaces at its proposed mosque to satisfy the Town's then-existing parking requirements.  As Jeff Vitale—the Town Planner tasked with calculating MOLI's parking requirement—put it on June 10, 2021: "Can we just make this easy and state Required 86 [parking spaces] and Proposed 86 [parking spaces]?"  *See supra* ¶¶ 100–104.

196.    To date, the Town has responded to this inconvenient fact with a made-for-litigation excuse.  According to the Town's May 1, 2025 sworn response to Plaintiffs' First Set of Interrogatories, Mr. Vitale was a "low level" staffer whose parking space calculation was preliminary and potentially incorrect under then existing law.

197.    The deposition testimony from Town officials tells a different story.  Plaintiffs have now deposed several Town employees, including Mr. Vitale, his immediate supervisor Deputy Commissioner of Planning and Development Scott Byrne, and the head of his department, former Commissioner of Planning and Development Maccarone.  Their testimony collectively establishes that Mr. Vitale was a diligent employee committed to treating all religions equally and whose June 10, 2021 parking calculation was a correct application of then-existing local law.  Furthermore, these deponents clarified that the Town's own consultants at

LKMA agreed with Mr. Vitale's parking calculation and that no one in Town government disagreed with it—at least prior to the start of this litigation. Indeed, Commissioner Maccarone testified that Mr. Vitale was a "very good employee" who she trusted to make independent determinations on required parking minimums. Mr. Byrne went further, describing Mr. Vitale as a "dream employee" and endorsing his 86-parking space calculation as the correct application of the Town's parking code prior to passage of Local Law No. 6. When asked whether he "agree[d] with Mr. Vitale's calculation under the standard as it existed in March 2021"—i.e., prior to the passage of Local Law No. 6—Mr. Byrne answered: "I do. At the code at that time, that's what it was."

198. These admissions prove that Mr. Vitale was not a rogue or incompetent employee (as the Town now makes him out to be), and that MOLI's application offered sufficient parking before the Town passed its discriminatory parking ordinance.

199. **Second, discovery confirms that there is no legitimate justification for Local Law No. 6.** The ordinance increased the amount of parking required for all houses of worship and specifically raised the number of parking spaces required of Plaintiffs' proposed mosque from 86 to 155—a roughly *82%* increase. In doing so, the law treats all houses of worship on less-than-equal terms with comparable secular facilities, like theaters, museums, and libraries. This is an open and shut violated of RLUIPA's Equal Terms provision, as the United States Department of Justice noted in its April 11, 2025 Statement of Interest in this case. *See* Dkt. 45.

200. Plaintiffs have now deposed the three individuals at the Town's Department of Planning and Development that were responsible for proposing the enactment: Commissioner Maccarone, Deputy Commissioner Byrne, and Deputy Commissioner Timothy Zike, who was deposed both as a fact witness and as the Town's corporate representative under Rule 30(b)(6) of

the Federal Rules of Civil Procedure. Their testimony reveals that Local Law No. 6 was proposed in a highly irregular manner. No study, report, memorandum, meeting notes, or even ***a single email*** was ever created by anyone in the Department to discuss or justify changing Town law with respect to parking requirements for places of worship—despite the enormous burden that such a change could have on religious groups' ability to construct new places of worship. Furthermore, according to Deputy Commissioner Zike, the only meetings his department held to discuss the religious worship aspects of Local Law No. 6 lasted "five, ten minutes at most." Such "[d]epartures from the normal procedural sequence" of how local zoning laws are generally amended—and indeed from how professionals normally communicate in the twenty-first century—suggest "that improper purposes . . . play[ed] a role" in the Town's passage of Local Law No. 6. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267 (1977).

201.    The circumstances surrounding passage of Local Law No. 6 are also substantively suspicious, as discovery has demonstrated that the amendment was not passed to address any legitimate, real-world problem. According to the Town's witnesses, no voter ever asked the Town to increase or change the parking requirements for houses of worship. Moreover, prior to the law's passage, the Town was not aware of any specific house of worship that lacked sufficient parking. In fact, the *only evidence* in Local Law No. 6's legislative history concerning parking at houses of worship comes from an individual who testified that the churches he was familiar with "seem[ed] to be well parked." *See supra* ¶ 120. The same individual testified to what he called "the elephant in the room": it was clear to him that the Town was passing Local Law No. 6 to prevent "certain people's usage of property." *See id.* In short, fact discovery has

confirmed Plaintiffs' observation in their original complaint that Local Law No. 6 was a discriminatory solution in search of a problem. *See supra* ¶ 117.

202. While the *legitimate* rationales for Local Law No. 6 proffered by the Town have not held water, during the course of discovery, the Town has brazenly confessed to an *illegitimate* motive for amending its parking ordinance. In a May 1, 2025 sworn response to Plaintiffs' First Set of Interrogatories, the Town admitted that Local Law No. 6 was passed because the Town viewed its existing parking ordinance as "unfair" because it "favor[ed] religions whose parishioners . . . pray while standing, leaning on lecterns, sitting on the floor, or sitting on non-fixed seatings." In other words, the Town passed Local Law No. 6 to specifically target building applications submitted by members of certain religions. When asked *which* religions prayed while standing, leaning on lecterns, sitting on the floor, or sitting on non-fixed seats, Deputy Commissioner Byrne answered Islam. He added: "I don't know if Hindu temples, do they have fixed seating? I really don't know." When asked the same question, Deputy Commissioner Zike answered "Hindu, Buddhists, Muslims or Islamic" [sic], adding "[t]here's forms of Christianity that might not be using fixed seating as well."

203. In other words, Local Law No. 6 was solely intended to target minority religious communities in the Town. This is textbook religious discrimination, made all the more blatant by Deputy Commissioner Zike's admissions as the Town's Rule 30(b)(6) corporate representative that the Town knew MOLI's application was pending when it passed Local Law No. 6 and knew that the law's passage would require MOLI to provide additional parking. Furthermore, according to Deputy Commissioner Zike, even despite knowing full well that Local Law No. 6 would burden MOLI's mosque, no arm of the Town *ever* considered an alternative to Local Law No. 6 that would have been less burdensome to MOLI's application.

204.    **Third, the Town's denial of Plaintiffs' Application was not narrowly tailored to further governmental interests in reducing traffic or promoting traffic safety.**  The Town offers two primary justifications for denying MOLI's application: (1) preventing the construction of the proposed mosque will reduce traffic at the intersection of Central and Stewart Avenues in Bethpage (where the mosque is located); and (2) preventing the construction of the proposed mosque will promote traffic safety at the same intersection.  Fact discovery has discredited each justification for the denial.

205.    For a start, the Town's purported concerns regarding traffic and traffic safety at this specific intersection are pretextual.  If the Town really wanted to reduce traffic or to improve traffic safety at this intersection, it presumably would have done *something* to promote those goals other than denying Plaintiffs' application.  Deposition testimony from Town officials reveals that no such steps were taken.  For example, when asked during his deposition whether he was aware of any steps taken by PAB or any other arm of the Town to reduce traffic or improve traffic safety near MOLI's mosque other than by denying MOLI's application, PAB Chairman Angelo Stanco answered with a single word: "No."

206.    Other deponents provided similar testimony.  For example, Deputy Commissioner Zike agreed that the Town never considered any steps to reduce traffic or to promote traffic safety near MOLI's mosque.  He further admitted that the Town never studied how to reduce traffic or promote traffic safety near MOLI's mosque; never considered lowering the speed limit near MOLI's mosque; never considered installing speed bumps near MOLI's mosque; never asked Nassau County to increase patrols for speeders near MOLI's mosque or to ticket illegally parked cars near MOLI's mosque; never considered expanding bike lanes, sidewalks, or public transit near MOLI's mosque; never launched an education or public awareness campaign about

the importance of traffic safety near MOLI's mosque; and never visited MOLI's mosque to encourage its parishioners to park and drive safely. Instead, the Town just denied MOLI's application outright.

207. Deputy Commissioner Zike further conceded that the Town is not aware of a *single accident* near MOLI's mosque that was caused by MOLI's mosque, much less an accident near MOLI's mosque that was caused by MOLI's mosque that involved a pedestrian or cyclist or that resulted in an injury or a fatality.

208. In fact, Deputy Commissioner Zike admitted that for all the Town knows, every single accident that has occurred near MOLI's mosque in recent years was, in fact, caused by the Town's Public Assembly Inspector Nick Condoleo who, in an ironic moment, sideswiped a women's car in May 2025 while pulling into MOLI's parking lot to help the Town conduct a site inspection in this case. (No one was injured.)

209. As Deputy Commissioner Zike's remarkable admissions illustrate, the Town does not have *any* evidence linking MOLI or its congregants to a *single* car accident during their more than two decades of operation at their current location. The Town nonetheless denied MOLI's application to build a much-needed house of worship because, in its telling, it thought building that house of worship might make traffic safety worse.

210. The Town's traffic and traffic safety arguments also assume that approving Plaintiffs' application would have worsened traffic safety. In reality, as discussed above, DER concluded that granting MOLI's application would "*improve* traffic safety." *See supra* ¶ 89 (emphasis added). During his deposition, PAB Chairman Stanco conceded that the PAB never received any evidence to the contrary and that he nonetheless voted to deny the application on traffic safety grounds. Deputy Commissioners Byrne and Zike also admitted that they were not

aware of any evidence that contradicted DER's conclusion that the Proposed Mosque would improve traffic safety—other than the unsubstantiated claims of community objectors at the PAB hearing on MOLI's application.

211. **Fourth, PAB received many egregiously anti-Muslim letters from community opponents of the mosque and then sided with uninformed opponents over land use experts.** The Town has never denied that PAB voted to deny MOLI's application after receiving numerous anti-Muslim letters from community members imploring PAB to oppose a new mosque in Bethpage. With the benefit of discovery, it is now clear that the PAB's sole and exclusive "evidence" to support its denial came from such letters and from other community members who opposed the mosque, and that all the actual experts in land use issues who studied MOLI's application endorsed it.

212. For example, PAB Chairman Stanco agreed during his deposition that he "voted with the non-professionals," i.e., members of the public claiming MOLI's application threatened traffic safety, "over the professionals," i.e., the traffic and traffic safety professionals at R&M, LKMA, and DER, all of whom concluded that Plaintiffs' application did not threaten traffic safety. He further admitted that he did not even bother to read the extensive study on traffic and traffic safety that R&M prepared on behalf of MOLI before voting to deny MOLI's application based on its alleged impacts on traffic and traffic safety.

213. Deputy Commissioner Byrne likewise admitted that when he weighed expert evidence against the evidence of community members who lacked any professional training or expertise in land use issues, "the residents . . . weighed heavier."

214. **Fifth, PAB's denial of Plaintiffs' application was a departure from its general practices of granting applications.** Discovery has shown that it is very unusual for PAB to

deny an application and that when it *does* deny an application, it is often reversed by courts that find its conduct to be arbitrary and capricious.

215.     Deputy Commissioner Byrne, for example, estimated that PAB has reviewed 50 to 70 applications since he became a voting member and has only denied two of them: MOLI's application and "an application on [80] Jericho Turnpike," the denial of which was later overturned by a state court as arbitrary and capricious.[47]

216.     Deputy Commissioner Byrne also believed PAB denied two other applications before he joined the Board—one from a Greek Orthodox Church where, as he put it, "neighbors came out and were upset about parking," and one for "apartments over stores" at Bagga Plaza in Hicksville, New York.   The latter of these denials was overturned by the Second Department, which explained the denial was "improperly based upon generalized community opposition." *See Bagga*, 934 N.Y.S.2d at 495.   These are words PAB should have heeded here but did not.

217.     Meanwhile, PAB Chairman Stanco—who has served on PAB for approximately thirty years—similarly testified that he could not recall any denial by PAB since January 2018 that was not subsequently overturned by a court.   He further testified that this case aside, he could not recall PAB *ever* denying the application of a house of worship.

218.     To summarize: PAB almost never denies applications, particularly for houses of worship, and when it *does* deny applications, its denials are as often as not reversed by courts— an astounding win-loss record given the deference courts afford local planning boards.

219.     **Sixth, PAB's denial of Plaintiffs' application was an unprecedent departure from its general practices of not inventing fake witnesses.**   It is also not PAB's standard

---

[47] This ruling is pending on appeal before the Second Department.   *See In re Matter of the Application of SFG ISF Syosset Jericho, LLC v. Angelo Stanco, et al.*, Docket No. 2024-09598 (2d Dep't).

practice to invent fake witnesses as evidence to cite in denying applications, but as PAB Chairman Stanco further conceded during his deposition, PAB made an exception for MOLI by relying on the troubles of a fictitious grandmother to justify its vote to deny MOLI's application.

220. Back in January when this Complaint was originally filed, Plaintiffs noted that PAB's paper-thin December 26, 2024 written denial prominently featured a resident who "testified that while dropping off her grandchildren at a local daycare in her [SUV] she was unable to fit down the residential streets with the overflow parking from the place of worship." *See supra* ¶ 174. Plaintiffs noted at the time that PAB appeared to have invented this testimony. *See id.* The Town later confirmed Plaintiffs' suspicions in a May 1, 2025 sworn response to Plaintiffs' First Set of Requests for Admission. In that document, the Town admitted that the grandmother in question was "partially an amalgam of testimony and written submissions." The Town then went on to cite two pieces of testimony as the ostensible components of their amalgamation, neither of which actually mention a grandmother, grandchildren, daycare, or an SUV. In other words, the grandmother is not an innocent composite character formed from the testimony of two real witnesses (which would be improper enough). Rather, she is a figment of the Town's imagination.

221. When confronted with these facts during his deposition, PAB Chairman Stanco agreed that PAB "depart[ed] from [its] normal practice" of not inventing fake witnesses "to invent a fake witness as evidence to deny this application." PAB Chairman Stanco further agreed that the denial should be "corrected at least" to remove reference to the fictional grandmother. He also testified that he was unaware of PAB ever making a similar misstatement in a denial.

222.     Similarly, during his deposition, Deputy Commissioner Zike agreed that the Town is now aware that this fictitious grandmother did not exist and conceded that the Town should correct the denial to eliminate any reference to her if, as he put it, "the Town attorney and the outside counsel tell it [to]."  Deputy Commissioner Zike further agreed that it was "strange" that the only denial of a religious institution's application that he could recall in the last ten years (MOLI's) was *also* the only denial he could think of that discussed testimony from a witness that does not exist.  When asked why this was strange, Deputy Commissioner Zike stated: "It just never happened before."

223.     As this testimony illustrates, PAB's denial of MOLI's application was truly unprecedented, both because denials are so rare and because the Town had to resort to manufacturing evidence to justify the denial for want of any real evidence to cite.

224.     **Seventh, the Town's conduct substantially burdened Plaintiffs' free exercise of religion.**  Defendant has also argued that its denial did not substantially burden Plaintiffs' free exercise of religion.  Once again, the Towns own witnesses disagree with the Town's litigation position.  Those witnesses have admitted the obvious: the Town's denial keeps MOLI trapped in an inadequate mosque.  For example, Public Assembly Inspector Condoleo testified during his deposition that MOLI's current mosque is "antiquated."  Deputy Commissioner Zike agreed, stating during his deposition that MOLI has outgrown its current location.  Deputy Commissioner Byrne went further still, stating during his deposition that the conditions at MOLI's mosque sound "terrible."  He continued: "I feel bad for MOLI and their congregants because it does sound like dire conditions there."  And when asked point blank whether MOLI's "existing situation impairs [Plaintiffs'] ability to exercise their religion," Mr. Byrne answered "I

think that is a fair assessment" before agreeing that he would not "want to exercise religion under those conditions."

225. **Eighth, Defendant treated MOLI worse than similarly situated entities, including other houses of worship.** Discovery has also uncovered extensive evidence of MOLI being treated worse than similarly situated entities elsewhere in the Town, including other non-Muslim houses of worship.

226. For example, documents produced by the Town show that, while the the Town refused to credit MOLI's representations that it would not use its proposed prayer space and basement multipurpose room simultaneously, it previously allowed a Sikh temple to construct a new place of worship after the temple agreed not to use its worship space and basement gathering room simultaneously. Notably, the Town made these accommodations to the Sikh temple in the course of settling claims that the Town had violated RLUIPA in connection with the Sikh temple's land use application. *See Guru Gobind Singh Sikh Center, Inc. v. Town of Oyster Bay, et al.*, 2:16-cv-03600 (E.D.N.Y.), Dkt. 17 ¶ 28 (consent order resolving litigation on several conditions, including: "the basement assembly space of the New Temple shall not be used for worship services, and only for ancillary use by congregants after worship services"). The Town has not offered any legitimate reason for granting the Sikh temple accommodations that is did not offer to MOLI.

227. Similarly, documents produced by the Town demonstrate that it applied a different, less onerous parking formula to classrooms in a Pentecostal Christian church than it applied to classrooms in MOLI's proposed mosque prior to the passage of Local Law No. 6, again without any valid basis for distinguishing between its treatment of the two faiths.

228.     Most egregiously, mere months before denying MOLI's application, PAB approved the site plan application of a Jehovah's Witnesses church that faced similar parking challenges.  The church's large 53,743-square-foot structure had a maximum occupancy of 2,834 people.  However, the church volunteered to cap its occupancy at 2,100 attendees on the grounds that that was the most people that it expected to attend services.  Applying the Town's new one parking space per every three persons occupancy formula under Local Law No. 6 to the church's *voluntary* occupancy limit of 2,100 people, the Town calculated that the church needed to provide 700 parking spaces.  The church provided 710 parking spaces, so PAB approved its application.  Had the Town applied the same parking formula to the Jehovah's Witnesses church's *actual* occupancy, the church would have needed to provide 945 parking spaces and so would have been a full 235 parking spaces short of the minimum required of it by Local Law No. 6.  However, due to the Town's accommodation of the Jehovah's Witnesses church's request for an occupancy cap, the church was able to obtain the necessary approvals from the PAB.

229.     This application of the Town's amended parking formula to the Jehovah's Witnesses church's proposed *voluntary* occupancy limit rather than to its *actual* maximum occupancy is precisely what MOLI asked of PAB during the July 18, 2024 hearing, and it is exactly what PAB refused to do.  As discussed above, at that meeting, MOLI offered to voluntarily cap its occupancy at 264 people so that it would be required to provide 88 parking spaces rather than 155 spaces.  PAB rejected MOLI's proposal out of hand, even though it had agreed to much the same proposal just a few months previously when a Christian church made it.

230.     Put differently, the Jehovah's Witnesses church *only* had enough parking because the Town accepted its proposed voluntary occupancy limit, and MOLI *only* did not have enough

parking under the Town's current parking code because PAB refused to accept a similar voluntary occupancy limit from it. This is cut and dried religious discrimination.

231. In sum, discovery has revealed that MOLI was treated differently—and worse—than other non-Muslim houses of worship that have appeared before the Town's land use bodies in recent years.

232. **Ninth, the Town now asserts unfettered and unconstitutional discretion to deny applications**. Finally, as the evidence has piled up demonstrating that Plaintiffs' proposed mosque provided sufficient parking under the applicable local law prior to its amendment—and as the Town's justifications for passing Local Law No. 6 have crumbled—the Town has reached for an escape hatch to justify its denial of Plaintiffs' application. Specifically, the Town now asserts that PAB has boundless, unfettered discretion to deny site plan applications.

233. For example, Deputy Commissioner Byrne testified during his deposition: "As a planning board member, I am not looking at the [Town parking] code as much. I am looking at the testimony and feeling and digesting everything they give me and weighing that testimony." When Plaintiffs asked if that meant his "decisions as a Planning Board member are less about the code and more about [his] feelings at the meeting," Deputy Commissioner Byrne replied "Yes." Of course, "feelings" are not a rational basis on which to base government decisions—particularly when the decision in question concerns the constitutional right to worship—so Plaintiffs continued to ask Deputy Commissioner Byrne whether PAB applied *any* standard to determine whether to grant or deny an application. Deputy Commissioner Byrne repeatedly testified that no such standard exists. For instance, he stated: "I would say there is no standard . . . Every application is different, so you have to make your decision based on the testimony given that night."

234.    Later, on redirect, counsel for the Town directed Deputy Commissioner Byrne to a specific section of the Oyster Bay Town Code, Section 246-6 § 6.10, and asked him whether PAB applied that section in connection with site plan applications.  Deputy Commissioner Byrne answered that it did.

235.    That section of the Town Code sets forth what it calls "general standards" to "guide[]" PAB, Planning and Development, and other "reviewing agenc[ies] "[i]n considering proposed site plans."  Oyster Bay Town Code, Chapter 246-6 § 6.10.  However, its language is too vague and capacious to properly cabin the PAB's discretion to make site plan determinations.

236.    For example, one of the "general standards" in Section 6.10 directs "the reviewing agency" to consider "[t]he location, arrangement and adequacy of off-street parking and loading facilities."  *See id.* § 6.10.1.4.  It is unclear from the face of the statute what this language means and whether it authorizes the PAB to deny applications for lack of off-street parking even when the application meets the parking requirements established by the Town's schedule of off-street parking.

237.    Plaintiffs asked Commissioner Maccarone about this subsection of Town code during her deposition.  Even though Commissioner Maccarone worked for the Department of Planning and Development for approximately 20 years, led it for approximately five years, and was familiar with Chapter 246 of the Town Code, she was not sure what this particular provision meant.  For instance, she testified that she thought it could allow the Town to require 36 off-street parking spaces for a hypothetical restaurant that was otherwise required to provide 35 off-street parking spaces under the Town parking schedule's more specific requirements.  On the other hand, she testified that she did not know whether this provision would allow the Town to require 40 spaces instead.  She further testified that she did not know whether this provision

would allow PAB to require 87 or 97 parking spaces from MOLI if the Town parking schedule otherwise required the mosque to provide just 86 parking spaces. Per Commissioner Maccarone: "[T]o me this is a vague section of the code."

238. Plaintiffs similarly asked Commissioner Maccarone to explain another "general standard" in the Town Code, Section 6.10.1.1, which directs the reviewing agency to consider "[t]he effect of the proposed development on traffic conditions on existing streets." Plaintiffs asked Commissioner Maccarone whether this provision would allow the Town to deny an application whenever it believed that an application would result in increased traffic. She answered that she believed it did. Then, when asked whether this section afforded the PAB discretion to deny an application whenever the PAB thinks there will be a negative impact on traffic as a result of that application, she again answered that it did.

239. Based on this testimony from Commissioner Maccarone and Deputy Commissioner Byrne, it appears that the Town is now asserting unfettered discretion under Section 6.10 of the Town Code to deny any application it dislikes, so long as the PAB feels, in its subjective, unbounded discretion, that the application could negatively impact parking or traffic. This is a recipe for discriminatory decision-making—which is precisely what occurred when the PAB denied MOLI's application despite the expert evidence supporting its approval.

## FIRST CAUSE OF ACTION

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000
42 U.S.C. § 2000cc(b)(1) – "Equal Terms" – Facial Challenge**

240. Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

241. Section 2(b)(1) of RLUIPA prohibits any government from imposing or implementing land use regulations in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

242. Defendants have violated RLUIPA by imposing land use regulations that facially treat houses of worship on less than equal terms than similarly situated secular organizations. Specifically, the Town imposes a parking minimum on houses of worship that diverges from the minimum for similarly situated secular assemblies like theaters.

243. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

244. Plaintiffs are entitled to declaratory and injunctive relief.

245. Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000 42 U.S.C. § 2000cc(b)(1) – "Equal Terms" – As Applied Challenge

246. Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

247. Section 2(b)(1) of RLUIPA prohibits any government from imposing or implementing land use regulations in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

248. Defendants have violated RLUIPA by implementing land use regulations in a manner that has treated Plaintiffs on less than equal terms than similarly situated secular organizations. Among other things, Defendants have applied a higher parking minimum to the Application than to similarly situated secular uses, like theaters.

249. Defendants have also admitted to enforcing their land use regulations against Plaintiffs but not against other non-residential uses that Defendants have deemed "non-conforming" to those regulations.

250. Such unequal treatment of Plaintiffs violates the equal terms provision in Section 2(b)(1) of RLUIPA. 42 U.S.C. § 2000cc(b)(1).

251. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

252. Plaintiffs are entitled to declaratory and injunctive relief.

253. Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(b)(2) – "Non-Discrimination" – Facial Challenge

254. Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

255. Section 2(b)(2) of RLUIPA prohibits municipal governments from imposing or implementing land use regulations in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination.

256. The Town has violated RLUIPA by imposing land use regulations with the intent of discriminating against Plaintiffs on the basis of religion. Among other things, the Town increased the parking requirements for houses of worship with the intent of disadvantaging religious assemblies.

257. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

258. Plaintiffs are entitled to declaratory and injunctive relief.

259. Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(b)(2) – "Non-Discrimination" – As Applied Challenge

260. Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

261.     Section 2(b)(2) of RLUIPA prohibits municipal governments from imposing or implementing land use regulations in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination.

262.     Defendants have violated RLUIPA by implementing land use regulations in a manner that intentionally discriminates against Plaintiffs on the basis of religion.  Among other things, Defendants have applied the Town's minimum parking requirements in an intentionally discriminatory manner.

263.     Additionally, the Town's minimum parking requirements have adversely affected Plaintiffs and were motivated by discriminatory animus towards Plaintiffs' religion.

264.     Defendants also enforced their land use regulations against Plaintiffs in a discriminatory manner.  Indeed, Defendants have admitted to enforcing their land use regulations against Plaintiffs but not against other non-residential uses that Defendants have deemed "non-conforming" to those regulations.

265.     Plaintiffs have suffered damages as a result of Defendants' illegal actions.

266.     Plaintiffs are entitled to declaratory and injunctive relief.

267.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(a) – "Substantial Burden"

268.     Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

269.     Section 2(a) of RLUIPA prohibits any government from imposing or implementing land use regulations in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government

demonstrates that imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

270.     Defendants have imposed and implemented land use regulations that place a substantial burden on Plaintiffs' religious exercise without a compelling governmental interest and without using the least restrictive means of achieving any interest.  Among other things, Defendants have prevented Plaintiffs from having adequate facilities to practice their religious faith by subjecting Plaintiffs' application to arbitrary, excessive, and discriminatory burdens, and ultimately rejecting it.

271.     Defendants' imposition of the burdens was not in furtherance of a compelling government interest, nor did Defendant use the least restrictive means of furthering their interests.

272.     Plaintiffs have suffered damages as a result of Defendants' illegal actions.

273.     Plaintiffs are entitled to declaratory and injunctive relief.

274.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Violation of the United States Constitution
### Free Exercise of Religion:  First and Fourteenth Amendments
### 42 U.S.C. § 1983 – Facial Challenge

275.     Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

276.     The First Amendment of the United States Constitution, as incorporated through the Fourteenth Amendment, prohibits a state or any political subdivision thereof from prohibiting the free exercise of religion.

277.   In committing the acts alleged above, Defendants were acting under color of state law.

278.   Defendants have violated and continue to violate Plaintiffs' rights under the Free Exercise Clause by discriminating against Plaintiffs on the basis of religious belief.  Among other things, Defendants have burdened Plaintiffs' sincere religious practice by changing the Town's parking requirements to single out houses of worship for especially harsh treatment.

279.   Plaintiffs have suffered damages as a result of Defendants' illegal actions.

280.   Plaintiffs are entitled to declaratory and injunctive relief.

281.   Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

**Violation of the United States Constitution**
**Free Exercise of Religion:  First and Fourteenth Amendments**
**42 U.S.C. § 1983 – As-Applied Challenge**

282.   Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

283.   The Free Exercise Clause prohibits a state or any political subdivision thereof from prohibiting the free exercise of religion.

284.   In committing the acts alleged above, Defendants were acting under color of state law.

285.   Defendants have violated and continue to violate Plaintiffs' rights under the Free Exercise Clause by discriminating against Plaintiffs on the basis of religious belief.  Defendants discriminated against Plaintiffs by amending the Town's minimum parking requirements and denying Plaintiffs' site plan application based on discriminatory animus towards Plaintiffs' religion.

286.     Plaintiffs have suffered damages as a result of Defendants' illegal actions.

287.     Plaintiffs are entitled to declaratory and injunctive relief.

288.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

**Violation of the United States Constitution**
**Equal Protection:  Fourteenth Amendment**
**42 U.S.C. § 1983 – Facial Challenge**

289.     Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

290.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits a state or any political subdivision thereof from denying to any person within its jurisdiction the equal protection of the laws.

291.     In committing the acts alleged above, Defendants were acting under color of state law.

292.     Defendants have violated and continue to violate Plaintiffs' rights under the Equal Protection Clause by intentionally discriminating against Plaintiffs on the basis of religious belief.  Among other things, Defendants changed the Town's minimum parking requirements to expressly classify on the basis of religion.

293.     Plaintiffs have suffered damages as a result of Defendants' illegal actions.

294.     Plaintiffs are entitled to declaratory and injunctive relief.

295.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

# NINTH CAUSE OF ACTION

### Violation of the United States Constitution
### Equal Protection: Fourteenth Amendment
### 42 U.S.C. § 1983 – As-Applied Challenge

296. Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

297. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits a state or any political subdivision thereof from denying to any person within its jurisdiction the equal protection of the laws.

298. In committing the acts alleged above, Defendants were acting under color of state law.

299. Defendants have violated and continue to violate Plaintiffs' rights under the Equal Protection Clause by discriminating against Plaintiffs on the basis of Plaintiffs' religion. Among other things, Defendants have applied the Town's minimum parking requirements in an intentionally discriminatory manner. Additionally, the Town's minimum parking requirements have adversely affected Plaintiffs and were motivated by discriminatory animus towards Plaintiffs' religion. Defendants have also treated Plaintiffs differently relative to other communities of faith, on the basis of their religion, and without any compelling government interest or by using narrowly tailored means to accomplish such interest.

300. Defendants have also admitted to enforcing their land use regulations against Plaintiffs but not against other non-residential uses that Defendants have deemed "non-conforming" to those regulations.

301. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

302. Plaintiffs are entitled to declaratory and injunctive relief.

303.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### Violation of the New York Constitution
### Free Exercise of Religion:  Art. 1, § 3 – Facial Challenge

304.     Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

305.     Article I, Section 3 of the New York Constitution guarantees the free exercise of religion.

306.     Defendants have violated and continue to violate Plaintiffs' rights under the New York Constitution by interfering with Plaintiffs' freedom of worship.  The Town's change to its minimum parking requirements has directly impeded Plaintiffs' sincerely held beliefs by unreasonably burdening houses of worship on the basis of religion, without serving any countervailing social or constitutional interest.

307.     Plaintiffs are entitled to declaratory and injunctive relief, as well as civil damages and fines from Defendants.

## ELEVENTH CAUSE OF ACTION

### Violation of the New York Constitution
### Free Exercise of Religion:  Art. 1, § 3 – As-Applied Challenge

308.     Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

309.     Article I, Section 3 of the New York Constitution guarantees the free exercise of religion.

310.     Defendants have violated and continue to violate Plaintiffs' rights under the New York Constitution by unreasonably interfering with Plaintiffs' freedom of worship.  Defendants

discriminated against Plaintiffs by amending the Town's minimum parking requirements and denying Plaintiffs' site plan application based on animus towards Plaintiffs' religion.

311.    Defendants' discriminatory actions have unreasonably burdened Plaintiffs' sincerely held beliefs, without serving any countervailing social or constitutional interest.

312.    Plaintiffs are entitled to declaratory and injunctive relief, as well as civil damages and fines from Defendants.

## TWELFTH CAUSE OF ACTION

### New York Civil Practice Law and Rules Article 78
### N.Y. C.P.L.R. § 7803

313.    Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

314.    Article 78 of the New York Civil Practice Law and Rules permits plaintiffs to proceed against government bodies and officers to challenge determinations that are arbitrary or capricious, an abuse of discretion, or affected by an error of law.

315.    Defendants' denial of Plaintiffs' site plan application was arbitrary and capricious.  Moreover, because Defendants misconstrued and misapplied the relevant legal standards, Defendants' determination was an abuse of discretion and affected by an error of law.

316.    Plaintiffs have suffered injury as a result of the unlawful actions of Defendants.

317.    Plaintiffs are therefore entitled to mandatory and prohibitory relief vacating Defendants' denial of Plaintiffs' site plan application and remanding the matter to Defendants with directions to approve Plaintiffs' application.

## THIRTEENTH CAUSE OF ACTION

### Violation of the United States Constitution
### Due Process Clause: Fourteenth Amendment
### 42 U.S.C. § 1983 – As-Applied Challenge

318.     The Due Process Clause of the Fourteenth Amendment prohibits statutes that fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute as well as statutes that authorize or encourage arbitrary and discriminatory enforcement.  Further, under Supreme Court precedent interpreting the Due Process Clause, statutes must provide explicit standards for those who apply them to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

319.     The facts unearthed during discovery to date confirm that Jeff Vitale's June 2021 parking calculation—that MOLI was required to provide 86 parking spaces and in fact provided 86 parking spaces—was a correct application of the Town's then-existing parking schedule to MOLI's proposed mosque.  *See supra* ¶ 103.

320.      This is a major problem for the Town.  It cannot credibly argue that Plaintiffs' application was short on parking under the Town's parking schedule as it existed *prior* to the passage of Local Law No. 6; nor can it argue that Plaintiffs' application was short on parking under the Town's parking schedule as it existed *after* passage of Local Law No. 6, given that amendment's legal infirmities.

321.     The Town has therefore groped for a new statutory hook to legitimize its pretextual claim that Plaintiffs' application did not provide enough parking.  It now argues that the PAB was free to deny Plaintiffs' application on parking grounds because, in its telling, Chapter 246 of the Oyster Bay Town Code creates an escape hatch for the PAB, in its unfettered discretion, to deny any application it dislikes for lack of parking or because of purported traffic concerns.

322.     Oyster Bay Town Code Section 246-6 § 6.10 provides, in part:

In considering proposed site plans, the reviewing agency will be guided by the purposes of this chapter, including the purposes of the applicable zoning district or districts, the specific off-street parking and site design standards as set forth in this chapter and the following general standards:

6.10.1.1. *The effect of the proposed development on traffic conditions on existing streets*.

6.10.1.2. The number, locations and dimensions of vehicular and pedestrian entrances, exits, drives and walkways.

6.10.1.3. The adequacy of safe visibility at all exit points of the site. The driver of an automobile should have an unobstructed view of the street for the distance necessary to allow safe entrance into the traffic stream.

6.10.1.4. *The location, arrangement and adequacy of off-street parking and loading facilities*. (Emphases added.)

323. To the extent the portions of Chapter 246-6 § 6.10 italicized above require applicants such as Plaintiffs to provide additional off-street parking above and beyond the off-street parking required by the Town's off-street parking schedule, or allow the PAB to deny any application it believes may negatively impact traffic, they violate the Due Process Clause of the Fourteenth Amendment. These portions of the Town Code fail to provide members of the public, including Plaintiffs, a reasonable opportunity to ascertain the number of parking spaces required for a particular use, including mosques; authorize arbitrary and discriminatory enforcement by the PAB with respect to traffic and the parking spaces required for a particular use, including mosques; and do not provide an explicit standard for the PAB to avoid resolution on an *ad hoc* and subjective basis. These constitutional flaws resulted in an arbitrary and discriminatory application with respect to Plaintiffs. Specifically, the PAB now claims it did not apply the Town's schedule of off-street parking to calculate Plaintiffs' parking requirements—because Plaintiffs met the requirements under that schedule prior to its discriminatory and unlawful amendment—and instead enforced a standardless and vague requirement that Plaintiffs provide "adequa[te] off-street parking and loading facilities." Plaintiffs have no idea how many parking spaces they would have needed to provide to satisfy this standard. Furthermore, to the

extent Defendant applied Section 6.10.1.1 to deny Plaintiffs' application because of purported traffic concerns, that section too is too vague to be understood by MOLI or anyone else and appears to improperly afford the PAB boundless discretion to deny applications.

324.  In committing the acts alleged above, the PAB and the Town were acting under color of state law.

325.  The portions of Chapter 246-6 § 6.10 italicized above are severable from the remainder of that provision under Chapter 246 Section 15.1 of the Oyster Bay Town Code, which reads as follows: "Should any section, subsection, paragraph, sentence, clause, provision or phrase of this chapter be declared by any court of competent jurisdiction to be unconstitutional or invalid, such decision shall not affect any other portion of this chapter."

326.  Plaintiffs are entitled to a declaratory judgment that the portions of Chapter 246-6 § 6.10 italicized above violate the Due Process Clause of the Fourteenth Amendment and that the portions of Chapter 246-6 § 6.10 italicized above are severable from the remainder of the ordinance.

327.  Plaintiffs are entitled to a declaratory judgment that the portions of Chapter 246-6 § 6.10 italicized above are null and void.

## FOURTEENTH CAUSE OF ACTION

### Violation of the New York Constitution
### Due Process Clause: Art. 1, § 6 – As-Applied Challenge

328.  The Due Process Clause of the New York State Constitution provides that "No person shall be deprived of life, liberty or property without due process of law."  Under this protection, statutes must be sufficiently clear to give a person or ordinary intelligence fair notice that their contemplated conduct is forbidden.  Furthermore, statutes must provide officials with

clear standards of enforcement so as to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

329.   The facts unearthed during discovery to date confirm that Jeff Vitale's June 2021 parking calculation—that MOLI was required to provide 86 parking spaces and in fact provided 86 parking spaces—was a correct application of the Town's then-existing parking schedule to MOLI's proposed mosque. *See supra* ¶ 103.

330.   This is a major problem for the Town. It cannot credibly argue that Plaintiffs' application was short on parking under the Town's parking schedule as it existed *prior* to the passage of Local Law No. 6; nor can it argue that Plaintiffs' application was short on parking under the Town's parking schedule as it existed *after* passage of Local Law No. 6, given that amendment's legal infirmities.

331.   The Town has therefore groped for a new statutory hook to legitimize its pretextual claim that Plaintiffs' application did not provide enough parking. It now argues the PAB was free to deny Plaintiffs' application on parking grounds because, in its telling, Chapter 246 of the Oyster Bay Town Code creates an escape hatch for the PAB, in its unfettered discretion, to deny any application it dislikes for lack of parking or because of purported traffic concerns.

332.   Oyster Bay Town Code 246-6 § 6.10 provides, in part:

> In considering proposed site plans, the reviewing agency will be guided by the purposes of this chapter, including the purposes of the applicable zoning district or districts, the specific off-street parking and site design standards as set forth in this chapter and the following general standards:
> 6.10.1.1.  *The effect of the proposed development on traffic conditions on existing streets.*
> 6.10.1.2.  The number, locations and dimensions of vehicular and pedestrian entrances, exits, drives and walkways.

6.10.1.3.  The adequacy of safe visibility at all exit points of the site.  The driver of an automobile should have an unobstructed view of the street for the distance necessary to allow safe entrance into the traffic stream.

6.10.1.4.  *The location, arrangement and adequacy of off-street parking and loading facilities*.  (Emphases added.)

333.    To the extent the portions of Chapter 246-6 § 6.10 italicized above require applicants such as Plaintiffs to provide additional off-street parking above and beyond the off-street parking required by the Town's off-street parking schedule, or allow the PAB to deny any application it believes may negatively impact traffic, they violate the Due Process Clause of the New York State Constitution.  These portions of the Town Code fail to provide members of the public, including Plaintiffs, a reasonable opportunity to ascertain the number of parking spaces required for a particular use, including mosques; authorize arbitrary and discriminatory enforcement by the PAB with respect to traffic and the parking spaces required for a particular use, including mosques; and do not provide an explicit standard for the PAB to avoid resolution on an *ad hoc* and subjective basis.  These constitutional flaws resulted in an arbitrary and discriminatory application with respect to Plaintiffs.  Specifically, the PAB now claims it did not apply the Town's schedule of off-street parking to calculate Plaintiffs' parking requirements— because Plaintiffs met the requirements under that schedule prior to its discriminatory and unlawful amendment—and instead enforced a standardless and vague requirement that Plaintiffs provide "adequa[te] off-street parking and loading facilities."  Plaintiffs have no idea how many parking spaces they would have needed to provide to satisfy this standard.  Furthermore, to the extent Defendant applied Section 6.10.1.1 to deny Plaintiffs' application because of purported traffic concerns, that section too is too vague to be understood by MOLI or anyone else and appears to improperly afford PAB boundless discretion to deny applications.

334.    In committing the acts alleged above, the PAB and the Town were acting under color of state law.

335.    The portions of Chapter 246-6 § 6.10 italicized above are severable from the remainder of that provision under Chapter 246 Section 15.1 of the Oyster Bay Town Code, which reads as follows: "Should any section, subsection, paragraph, sentence, clause, provision or phrase of this chapter be declared by any court of competent jurisdiction to be unconstitutional or invalid, such decision shall not affect any other portion of this chapter."

336.    Plaintiffs are entitled to a declaratory judgment that the portions of Chapter 246-6 § 6.10 italicized above violate the Due Process Clause of the New York State Constitution and that the portions of Chapter 246-6 § 6.10 italicized above are severable from the remainder of the ordinance.

337.    Plaintiffs are entitled to a declaratory judgment that the portions of Chapter 246-6 § 6.10 italicized above are null and void.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment in their favor and the following relief:

a)  An Order finding and declaring that PAB's December 26, 2024 denial of MOLI's site plan violates RLUIPA and is, therefore, null and void;

b)  An Order finding and declaring that PAB's December 26, 2024 denial of MOLI's site plan violates the First Amendment and is, therefore, null and void;

c)  An Order finding and declaring that PAB's December 26, 2024 denial of MOLI's site plan violates the Fourteenth Amendment and is, therefore, null and void;

d)  An Order finding and declaring that PAB's December 26, 2024 denial of MOLI's site plan violates the New York Constitution and is, therefore, null and void;

e) An Order finding and declaring that PAB's December 26, 2024 denial of MOLI's site plan was arbitrary, capricious, unreasonable, an abuse of discretion, and otherwise unlawful under Article 78 and is, therefore, null and void;

f) An Order finding and declaring that Local Law No. 6 violates RLUIPA and the U.S. and New York Constitutions and is, therefore, null and void;

g) An Order declaring that the portions of Chapter 246-6 § 6.10 italicized above at paragraphs 322 and 332 are invalid and unconstitutional under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Due Process Clause of the New York State Constitution;

h) Preliminary and final injunctions restraining Defendants from impeding Plaintiffs' efforts to develop a mosque at 300 and 320 Central Avenue, Bethpage consistent with submissions made by MOLI to the Town in advance of the July 18, 2024 PAB meeting;

i) Preliminary and final injunctions ordering Defendants to grant, forthwith and no more than 10 days from the date of the Court's Order, final approval to Plaintiffs' site plan and related submissions made to the Town in advance of the July 18, 2024 PAB meeting;

j) Appointment of a federal monitor to oversee Defendants' implementation and compliance with this Court's remedial orders, as well as Defendants' continuing compliance with federal law in all decisions of the Town, PAB, Department of Planning and Development, and DER for a period of five years;

k) An Order mandating training for each and every one of Defendants' officials and agents engaged in the implementation of land use regulations as to the requirements and obligations imposed on state and municipal actors by RLUIPA, the U.S. Constitution, and the New York Constitution;

l) Compensatory damages in an amount to be determined at trial;

m) Punitive damages;

n) Nominal damages;

o) Reasonable costs and expenses of this action, including an award of reasonable attorney's fees under 42 U.S.C. §§ 1983 and 1988 in an amount to be determined by the Court;

and other appropriate relief to be determined at trial.

Dated:  September 12, 2025

Respectfully submitted,

By: */s/Muhammad U. Faridi*
Muhammad U. Faridi
Diana M. Conner
Julia Long
Peter Vogel
Kailyn LaPorte
**LINKLATERS LLP**
1290 Avenue of the Americas
New York, New York 10104
Telephone No.:  (212) 903-9000
Facsimile No.:  (212) 903-9100

*Attorneys for Plaintiffs*